414 A.2d 318

COMMONWEALTH of Pennsylvania, Plaintiff,

v.

David HAYES.

In re PETITION OF the PITTSBURGH PRESS,

Tribune-Review Publishing Co., WTAE–TV, Post Gazette Publishing Co. and First Amendment Coalition, Intervenors.

Supreme Court of Pennsylvania.

Argued March 11, 1980.

Decided May 1, 1980.

John H. Bingler, Jr., Thorp, Reed & Armstrong, Clyde H. Slease, III, Pittsburgh, for petitioner.

Robert Vincler, Kemal A. Mericli, Asst. Dist. Attys., Pittsburgh, for plaintiff.

Thomas A. Livingston, Livingston, Miller, O'Malley & Clark, Pittsburgh, for David S. Hayes.

Walter T. McGough, Reed, Smith, Shaw & McClay, John P. McComb, Jr., P. Jerome Richey, Moorhead & Knox, Pittsburgh, for WTAE–TV.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION

NIX, Justice.

This lawsuit represents yet another dispute in the continuing controversy between "free press" and "fair trial." The increasing frequency of these disputes and the mounting acrimony engendered graphically demonstrates the need for clear and decisive judicial direction in this area. One of the major reasons for the difficulty in obtaining acceptable solutions has been a lack of objectivity and flexibility in approaching the difficult problems involved. The issue too frequently is framed as one of competing unalterable principles, rending an accommodation unnecessarily difficult. The analysis employed in these controversies has been undermined by the temptation to extol the superiority of one right over the other and a lack of regard for the more pressing need to harmonize the respective interests.

The accused in the instant case is an elected state official who has been charged with sexually assaulting and supplying drugs to a 17 year old male high school student.

A suppression hearing had been reserved for the start of the trial, and upon the conclusion of the hearing, the trial would commence. At the request of the defense counsel, pursuant to Pa.R.Crim.P. 323(f), Judge Strauss of the Allegheny Court of Common Pleas granted the defense motion to close the suppression hearing. The Commonwealth concurred with the defense motion to close the hearing to the public and the press.

A representative of the *Pittsburgh Press* newspaper objected to the order and sought permission to intervene to protect the public and the *Press's* interest in an open hearing. Judge Strauss granted the *Press's* petition to intervene, then denied the *Press's* motion for an open hearing. Judge Strauss also rejected the *Press's* suggestion that the jury selection be completed prior to the suppression hearing and that the jury panel then be sequestered.

Following these rulings, Judge Strauss postponed the suppression hearing to provide the *Press* an opportunity to seek review by this Court. The *Press* filed a Petition for Stay which was granted by Mr. Justice O'Brien. The *Press* also filed a Petition for Exercise of Plenary Jurisdiction, asking the full Court to hear and decide the Press's Petition for Summary Reversal of the Lower Court. The Supreme Court granted permission to all media organizations to intervene in this matter, and on March 11, 1980, the full Court heard oral arguments on the Petition for Summary Reversal.

I.

The most recent pronouncement of the U.S. Supreme Court on the subject is illustrative of the fragmentation that results where the approach adopted is to attempt to assign a qualitative value to the various competing interests involved. In *Gannett v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) the Court was called upon to determine whether a judge may order a closed pretrial

proceeding to safeguard the fair trial guarantee of the Sixth and Fourteenth Amendments of the federal Constitution.[1]

Mr. Justice Stewart in an opinion joined by Chief Justice Burger and Justices Powell, Rehnquist and Stevens, upheld the trial court's order of closure excluding the press from a pretrial suppression evidentiary hearing, where the prosecutor and the court agreed with the defense's assessment that an unabated buildup of adverse publicity was jeopardizing the accused's right to a fair trial. Mr. Justice Stewart justified his position by rejecting a claim that the Sixth Amendment accorded the public a right of access to public trials. *Id.* at 378–391, 99 S.Ct. at 2905–2911, 61 L.Ed.2d at 621–28. In support of his position, he offered two separate reasons. First, he drew from the historical development of the Sixth Amendment to conclude that the public has no right under its provisions to attend criminal trials. *Id.* 443 U.S. 386 at n. 15, 99 S.Ct. 2908–2909 at n. 15, 61 L.Ed.2d 625 at n. 15.[2] Second he argued in the alternative, in the event such a right to public access did exist under the Sixth and Fourteenth Amendments, it would not extend to pretrial proceedings. *Id.* at 387–391, 99 S.Ct. at 2909–2911, 61 L.Ed.2d at 626–28. Although stating that he was reserving the question as to the public's right of access under the First and Fourteenth Amendments, *id.* at 391–393, 99 S.Ct. at

---

**1.** Mr. Justice Stewart, author of the opinion for the Court, framed the issue as:

> The question presented in this case is whether members of the public have an independent constitutional right to insist upon access to a pretrial judicial proceeding, even though the accused, the prosecutor and the trial judge all have agreed to the closure of that proceeding in order to assure a fair trial.
> 443 U.S. at 370, 99 S.Ct. at 2901, 61 L.Ed.2d at 616.

**2.** This portion of his analysis has been criticized as being unclear as to whether the holding was intended to extend to trials or merely to pretrial hearings. The Supreme Court, 1978 Term, 93 Harv.L.Rev. 60, 65 (1979). The criticism is inspired by the last sentence of Mr. Justice Stewart's Sixth Amendment analysis which flatly states, "members of the public have no constitutional right under the Sixth and Fourteenth Amendments to attend criminal trials." 443 U.S. at 391, 99 S.Ct. at 2911, 61 L.Ed.2d at 628. The alternative argument offered by Mr. Justice Stewart would also indicate that he intended this broad holding.

2911–2912, 61 L.Ed.2d at 629, Mr. Justice Stewart did, however, implicitly limit whatever right might exist thereunder by concluding that in the case then before the Court, the trial court had satisfied those concerns. *Id.* at 391–394, 99 S.Ct. at 2911–2913, 61 L.Ed.2d at 629–30.[3]

Mr. Justice Powell joined the opinion for the Court, and also wrote a concurring opinion in which he considered the First Amendment issue. He expressed the view that the public has a right of access to both trials and pretrial hearings under the First Amendment and that right must be balanced against the defendant's right to a fair trial. *Id.* at 398–402, 99 S.Ct. at 2915–2917, 61 L.Ed.2d at 633–35. He concluded that closure could only be justified where it is demonstrated that the defendant would otherwise be prejudiced. *Id.* He was satisfied that the record in *Gannett* sufficiently established prejudiced to warrant closure in that case. *Id.* at 401–404, 99 S.Ct. at 2916–2918, 61 L.Ed.2d at 635–36. Mr. Justice Rehnquist also joined the opinion of the Court, and extended its holding by asserting that there is no public right of access under the First Amendment. *Id.* at 404–405, 99 S.Ct. at 2918, 61 L.Ed.2d at 637. Thus, he adopted the position that an accused seeking closure was not required to make a showing of harm and a trial judge was not required to give reasons for ordering closure. *Id.* at 403–405, 99 S.Ct. at 2917–2918, 61 L.Ed.2d at 636–37. Chief Justice Burger was also a member of the majority who chose

**3.** Mr. Justice Stewart emphasized that in his view an accused did not have a right to a private trial.

While the Sixth Amendment guarantees to a defendant in a criminal case the right to a public trial, it does not guarantee the right to compel a private trial. "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right." *Singer v. United States*, 380 U.S. 24, 34, 85 S.Ct. 783 [790], 13 L.Ed.2d 630.

*Id.* at 382, 99 S.Ct. at 2907 at 61 L.Ed.2d at 623.

Also, Mr. Justice Stewart noted that:

The question in this case is not, as the dissenting opinion repeatedly suggests, post, at [406, 99 S.Ct. at] 2919, [61 L.Ed.2d 636], whether the Sixth and Fourteenth Amendments give a defendant the right to compel a secret trial.

*Id.* at 382, 99 S.Ct. at 2907 n. 11, 61 L.Ed.2d at 623 n. 11.

to write a separate concurring opinion.[4] He advocated the position that the framers of the Constitution did not intend to include a public right of access to pretrial proceedings within the Sixth Amendment because, unlike trials, they were not open to the public at common law. *Id.* at 394–397, 99 S.Ct. at 2913–2914, 61 L.Ed.2d at 630–32.

The dissenting view, authored by Mr. Justice Blackmun, maintained that the public has a right under the Sixth Amendment to attend criminal proceedings.[5] Nonetheless, the dissent did recognize that closure of a pretrial suppression in a criminal case would be warranted if there was "a sufficient showing to establish the strict and inescapable necessity" for such an order. *Id.* at 448, 99 S.Ct. at 2940, 61 L.Ed.2d at 665.

If we were to focus our inquiry upon whether the various interests reached constitutional proportions, *Gannett* would provide little guidance. Although five members of the Court rejected the claim that the Sixth and Fourteenth Amendments conferred upon the public a right of access, at least to pretrial suppression proceedings, a majority of the Court did, however, conclude the public's right of access was constitutionally guaranteed. Although not accepting the four dissenters' Sixth Amendment position, Mr. Justice Powell did find the right constitutionally protected under the First Amendment.

. . . I would hold explicitly that petitioner's reporter had an interest protected by the First and Fourteenth Amendments in being present at the pretrial suppression hearing. As I have argued in *Saxbe v. Washington Post Co.*, 417 U.S. 843, 850, 94 S.Ct. 2811 [2815], 41 L.Ed.2d 514 (1974) (Powell, J., dissenting), this constitutional protection derives, not from any special status of members of the press as such, but rather because "[i]n seeking out the news the press . . . acts as an agent of the public at

4. Mr. Justice Stevens was the fifth member of the majority and he did not file a separate opinion.

5. *Id.* at 406–449, 99 S.Ct. at 2919–2941, 61 L.Ed.2d at 638–65, joined by Justices Brennan, White and Marshall.

large," each individual member of which cannot obtain for himself "the information needed for the intelligent discharge of his political responsibilities."

*Id.* at 397, 99 S.Ct. at 2914–2915, 61 L.Ed.2d 632.

Additionally, it must be remembered that the majority with the exceptions of Justices Powell and Rehnquist have yet to express a definitive view on the First Amendment's impact on the area in question.

However, whether or not the right of public access is of constitutional dimension is not critical to the problem usually raised in these disputes. Even if we interpret *Gannett* as establishing that the public right of access is constitutionally guaranteed, nevertheless, as noted by Mr. Justice Powell, it is not an absolute, unqualified right.

> The right of access to courtroom proceedings, of course, is not absolute. It is limited both by the constitutional right of defendants to a fair trial, see, e. g., *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and by the needs of government to obtain just convictions and to preserve the confidentiality of sensitive information and the identity of informants. Cf. *Procunier v. Martinez*, 416 U.S. 396, 412–413, 94 S.Ct. 1800 [1810–1811], 40 L.Ed.2d 224 [71 Ohio Ops.2d 139] (1974); *Houchins v. KQED*, 438 U.S. 1, 34–35, 98 S.Ct. 2588 [2607–2609], 57 L.Ed. 553 (1978) (Stevens, J., dissenting); *Saxbe v. Washington Post Co.*, supra, [417 U.S.] at 872–873, 94 S.Ct. [2811 at 2825–2826, 41 L.Ed.2d 514]. The task of determining the application of these limitations in each individual trial necessarily falls almost exclusively upon the court asked to exclude members of the press and public from the courtroom.

*Id.* at 398, 99 S.Ct. at 2915, 61 L.Ed.2d at 633.

Moreover, the members of the Court who would not assign constitutional stature to the public right of access, nonetheless, recognized the great societal interest in the right.

> There can be no blinking the fact that there is a strong societal interest in public trials. Openness in court proceedings may improve the quality of testimony, induce

unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously and generally give the public an opportunity to observe the judicial system.

Id. at 383, 99 S.Ct. at 2907, 61 L.Ed.2d at 623. (Opinion of the Court).

It is thus readily apparent that where a less restrictive alternative is available for assuring the fair trial guarantee and the use of that alternative does not unduly burden the expeditious disposition of the cause, all of the views expressed by the members of the *Gannett* Court would have no serious disagreement with a requirement that the alternative procedure should be opted for in preference to closure.

## II.

Turning next to the Constitution of this Commonwealth, it is to be noted that in addition to providing a right to the accused for "a speedy public trial," Art. 1, § 9, it also has the additional requirement that "all courts shall be open." Art. 1, § 11. It is suggested that Art. 1, § 11, which does not have a counterpart in the federal Constitution, places an added responsibility on the courts of this Commonwealth to protect the public's right of access. Unquestionably, the "all courts shall be open" provision has a firm foundation in our constitutional history, having been provided for in the 1682 Frame of Government and 1776 Constitution. Nevertheless, most of the decisions construing this phrase have been in the context of a citizen's right to a legal remedy for a wrong or injury. *See, e. g., Parker v. Children's Hospital of Phila.,* 483 Pa. 106, 394 A.2d 932 (1978); *Mayle v Pa. Dept. of Hwys.,* 479 Pa. 384, 388 A.2d 709 (1975); *Singer v. Sheppard,* 464 Pa. 387, 346 A.2d 897 (1975); *Dolan v. Linton's Lunch,* 397 Pa. 114, 152 A.2d 887 (1959).

The few cases that have considered this portion of Art. 1, § 11 with reference to the public's right of access have frequently intertwined the Art. 1, § 9 guarantee of a speedy public trial. This would suggest the implicit view that Art. 1, § 11 did not provide any greater right in this context than

that provided in Art. 1, § 9 and that the primary concern was tó assure the accused of protection against star-chamber proceedings. *See, e. g., Commonwealth v. Trinkle,* 279 Pa. 564, 124 A. 191 (1924).

> It was thought the presence of the public generally would constrain a court, otherwise predisposed, to accord the witness a fair trial. Convictions by secret trials were therefore abolished. Public trials, with public records, were introduced and our Constitution perpetuates this practice. *Id.,* 279 Pa. at 568, 124 A. at 192.

In *Commonwealth ex rel. Paylor v. Cavell,* 185 Pa.Super. 176, 138 A.2d 246 (1958) *cert. denied,* 358 U.S. 854, 79 S.Ct. 84, 3 L.Ed.2d 88, the Superior Court discussed at length the Pennsylvania constitutional ramifications of a public trial and the right to exclude spectators from criminal proceedings, mentioning Art. 1, § 11 *only in a footnote reference.*[6] Thus, our research of the appellate decisional law fails to uncover any support for the claim that Art. 1, § 11, open court provision, provides a greater right of access to the public in criminal trials than the public trial provisions of the federal and state Constitutions.

Our decisions do, however, make it clear that the courts of this Commonwealth may exclude members of the public from criminal proceedings where the interests of justice require. *Commonwealth v. Principatti,* 260 Pa. 587, 104 A. 53 (1918) (the court has the power to exclude persons from a courtroom during the testimony of a witness where that witness was in fear of retaliation by those present if they heard his testimony). *Commonwealth v. Trinkle, supra; Commonwealth ex rel. Paylor v. Cavell, supra.* Most recently, this Court held that a pretrial suppression hearing closure in order to protect the fair trial rights of the accused did not

---

**6.** *See* 185 Pa.Super. at 180 n. 3, 138 A.2d 246.

In this decision the Court indicated that "in a broad sense the right to a public trial is a right of the public" but that right did not diminish the fact that the public trial provision was primarily designed to protect the accused and that the accused had the right to waive the right. *Commonwealth ex rel. Paylor v. Cavell,* 185 Pa.Super. at 184, 138 A.2d 246, 250.

offend the Pennsylvania Constitution. *Philadelphia News-
papers, Inc. v. Jerome*, 478 Pa. 484, 387 A.2d 425 (1978).

Nevertheless, we terminate this review of the state consti-
tutional provisions, as we did with the federal Constitution,
with the conclusion that the use of closure of a pretrial
suppression proceeding may properly be limited where there
is an effective and efficient alternative means to assure the
accused's fair trial rights. This position is virtually com-
pelled by the language of Mr. Justice Roberts speaking for
the Court in *Philadelphia Newspapers, Inc. v. Jerome, supra,*
478 Pa. at 503–04, 387 A.2d at 434–435:

> We believe that any limitation on access should be
> carefully drawn. First, the right of access to court pro-
> ceedings should not be limited for any reason less than the
> compelling state obligation to protect constitutional rights
> of criminal defendants and the public interest in the fair,
> orderly, prompt, and final disposition of criminal proceed-
> ings. Second, access should not be limited unless the
> threat posed to the protected interest is serious. Third,
> rules or orders limiting access should effectively prevent
> the harms at which they are aimed. Finally, the rules or
> orders should limit no more than is necessary to accom-
> plish the end sought. Because the challenged Rules and
> orders are closely tailored to protecting both the constitu-
> tional right of defendants to a fair trial and the public's
> interest in the fair and efficient administration of criminal
> justice, we denied relief.[7]

7. Mr. Justice Roberts in a desperate attempt to provide legitimacy for
his position has deliberately ignored the obvious distinctions between
the facts presented in this record and those before the Court in
*Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa. 484, 387 A.2d 425
(1978). In *Jerome* we were faced with the question as to whether
closure could be utilized in a pre-trial proceeding *where it was
necessary to assure a fair trial.* Here the question is raised as to the
propriety of the use of closure *where the fair trial right of the
accused can be fully protected by a means which does not intrude
upon the public's access.* We are not here indulging in an "ad hoc
determination" for "media approval" (see dissenting opinion, Rob-
erts, J., page 338) but rather we are applying the principle announced
in *Jerome* (as articulated by Mr. Justice Roberts) to the facts of the
case before us.

## III.

The view that any limitation on the public's access to criminal judicial proceedings should be carefully drawn was reflected in all of the views expressed by the members of the Supreme Court in *Gannett.* As just mentioned, it was also the view of this Court in *Jerome.* The only point of difference was as to how stringent the requirements should be fashioned in determining the appropriate use of closure. For illustration, the dissenters in *Gannett* did

> . . . not deny that the publication of information learned in an open proceeding may harm irreparably, under certain circumstances, the ability of a defendant to obtain a fair trial.

443 U.S. at 439, 99 S.Ct. at 2936, 61 L.Ed.2d at 659. While this recognition occasioned them to accept that closure in some instances would be acceptable, their determination as to when it could be used represented the most circumscribed view. Mr. Justice Powell, whose position probably represents the middle ground, also recognized the need to limit the use of closure.

> Thus, where a defendant requests the trial court to exclude the public, it should consider whether there are alternative means reasonably available by which the fairness of the trial might be preserved without interfering substantially with the public's interest in prompt access to information concerning the administration of justice. Similarly, because exclusion is justified only as a protection of the defendant's right to a fair trial and the State's interest in confidentiality, members of the press and public objecting to the exclusion have the right to demand that it extend no farther than is likely to achieve these goals.

> *Id.,* at 400, 99 S.Ct. at 2916, 61 L.Ed.2d at 634 (Powell, J., concurring).

Even the view of Mr. Justice Stewart, which refused to recognize public access as a constitutionally protected guarantee under the Sixth and Fourteenth Amendments, nevertheless, conceded:

We certainly do not disparage the general desirability of open judicial proceedings.

At 393, 99 S.Ct. at 2912, 61 L.Ed.2d at 630.

The instant closure order was entered pursuant to Pa.R. Crim.P. 323(f)[8] at the express request of the defense and concurred in by the Commonwealth. Petitioner questions the sufficiency of the showing before the trial court of the need to involve the provisions of section (f) and also urges that there is a viable alternative in this case which eliminates the need of the closure order. We need not consider the former complaint since we agree with petitioner's latter position.[9] Even if we were to relegate the public's right to access to a common law tradition, there is no justification to deny the right on Sixth and Fourteenth Amendment grounds where an alternative measure could accomplish the desired result.

It is conceded in the case at bar that sequestration in this case can fully protect the defendant's fair trial rights. The court had previously scheduled this suppression hearing to be held immediately before the commencement of trial. Further, in view of the limited anticipated time to be consumed in this hearing, the use of sequestration will not be unduly burdensome, costly or inconvenient. In view of the availability of sequestration which, in this case, fully protects the accused's fair trial rights and does not impede

---

**8.** Pa.R.Crim.P. 323(f) provides:

The hearing, either before or at trial, shall be held in open court unless defendant moves that it be held only in the presence of the defendant, counsel for the parties, court officers and necessary witnesses. If the hearing is held after the jury has been sworn, it shall be held outside the hearing and presence of the jury. In all cases the court may make such order concerning publicity of the proceedings as it deems appropriate under Rules 326 and 327.

**9.** We recognize that the question of who possesses the burden of persuasion and the quantum of proof necessary to show the need for closure crystallizes the differences of the members of the *Gannett* Court. Although a definitive resolution is not now required in view of our disposition in this matter, it would appear the limitations articulated by Mr. Justice Roberts in *Jerome* are in accord with the middle ground adopted by Mr. Justice Powell in his concurring opinion.

the orderly resolution of the case or unduly increase the administrative costs, the trial court was without justification to invoke the provisions of 323(f) and thereby deny public access to these proceedings.

## IV.

The final question that must be considered is the defendant's contention that, although sequestration will protect his Sixth Amendment rights, his right of privacy would be jeopardized by its use in this case. Of course, if the defendant prevailed in this contention, we could not find that sequestration was an adequate and viable alternative. This novel argument was raised in oral argument by the defense and not briefed. Carried to its logical conclusion, it would require closure in all suppression proceedings where the admissibility of evidence belonging to or taken from the possession of the defendant is challenged. Our research of the development of the law of privacy offers no support for the protection the defendant presently seeks.

In the American jurisprudential system, both tort and constitutional law recognize that an individual has the right to be free from unwarranted invasions of privacy. The origin of the tort cause of action for invasion of privacy was an 1890 Harvard Law Review [10] article by Samuel P. Warren and Louis D. Brandeis. This article analyzed a number of cases in which relief had been granted on the basis of defamation, invasion of property rights, or breach of implied contract, and concluded that these cases were based on a broader principle entitled to separate recognition—the right to privacy. *See* Prosser, Law of Torts, 802 (1971) (hereinafter Prosser). Initially, American courts were divided in their acceptance of the new tort,[11] but after its recognition

10. Warren and Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193 (1890).

11. *See, e. g., Mackenzie v. Soden Mineral Springs Co.*, 27 Abb.N.C. 402, 18 N.Y.S. 240 (1891); *Marks v. Jaffa*, 6 Misc. 290, 26 N.Y.S. 908 (1893); *Schuyler v. Curtis*, 147 N.Y. 434, 42 N.E. 22 (1895); *Corliss v. E. W. Walker Co.*, D.Mass., 64 F. 280 (1894); *Atkinson v. John E. Doherty & Co.*, 121 Mich. 372, 80 N.W. 285 (1899).

in the Restatement of Torts, § 867 (1939),[12] the tide turned in favor of its acceptance.

The number of tort cases asserting a cause of action for invasion of privacy blossomed.[13] In 1960, three quarters of a century after the Warren and Brandeis article, Professor Prosser made a mammoth effort to bring order to the case law which was "tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff to be let alone."[14] In a significant scholarly article,[15] Professor Prosser categorized the first 400 privacy decisions dating back to the 1890's and organized the decisions under four headings: intrusion upon the plaintiff's seclusion or private affairs,[16] public disclosure of embarrassing private facts about the plaintiff,[17] publicity which places the plaintiff in a

**12.** The Restatement of Torts provides:
§ 867. Interference With Privacy.
A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other.

**13.** "Twelve states (plus Alaska and the District of Columbia) recognized legitimate privacy interests between 1890 and 1941; eighteen states had done so by 1956, and by 1960, thirty-one states had recognized privacy as a legitimate interest." O'Brien, Privacy and the Right to Access: Purposes and Paradoxes of Information Control, 30 Admin.L.Rev. 45, 66 (1978).

**14.** Prosser, Torts, 804 (4th Edit. 1971) [hereinafter Prosser]. Judge Cooley in his treatise, Cooley, Torts, 29 (2nd Edit. 1888), first coined the phrase the "right to be let alone." Warren and Brandeis adopted this phrase as a summary definition of privacy. 4 Harv.L.Rev. at 195.

**15.** Prosser, Privacy, 48 Cal.L.Rev. 383 (1963).

**16.** The tort of intrusion upon the plaintiff's seclusion or privacy consists of an act of prying or intruding, an intrusion objectionable to the reasonable person, and the thing to which there is an intrusion is private. Prosser at 808.

**17.** The tort of public disclosure of private facts consists of public disclosure by defendant of private information about the plaintiff and the matters disclosed are considered private by reasonable persons. Prosser at 809.

false light,[18] and appropriation of the plaintiff's name or likeness for the defendant's advantage.[19] Professor Prosser's scholarship has had a great influence on the developing case law [20] and the Restatement of Torts, Second, has adopted his categories for invasions of privacy.[21] Clearly, the tort theory is not helpful to the defendant in the instant case. Whether or not the anticipated disclosures would constitute the tort, his remedy would be damages for any loss sustained thereby not the closure of a proceeding where an improper disclosure might occur.

Constitutional law is the second area of American jurisprudence which provides relief to invasions of an individual's privacy. Although the United States Constitution does not explicitly mention an individual's right to privacy, for almost a century the Supreme Court has recognized that the right of personal privacy does exist under the Constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment, *Stanley v. Georgia*, 394 U.S. 557, 564 [, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542] (1969); in the Fourth and Fifth Amendments, *Terry v. Ohio*, 392 U.S. 1, 8–9 [88 S.Ct. 1868, 1872–1873, 20 L.Ed.2d 889] (1968), *Katz v. United States*, 389 U.S. 347, 350 [, 88 S.Ct. 507, 510, 19 L.Ed.2d 576] (1967), *Boyd v. United States*, 116 U.S. 616 [, 6 S.Ct. 524, 29 L.Ed. 746] (1886), see *Olmstead v. United States*, 277 U.S. 438, 478 [48 S.Ct. 564, 572, 72 L.Ed. 944] (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, *Griswold v. Connecticut*, 381 U.S. [479,] at 484–485

18. The tort of placing the plaintiff in a false light consists of publication of facts about plaintiff by defendant which places plaintiff in a false light, the false light is objectionable to reasonable people, and malice on the part of the defendant where the published matter is in the public interest. Prosser at 812.

19. This tort consists of the appropriation by defendant of plaintiff's name or likeness for the defendant's commercial advantage. Prosser at 805.

20. *See* the discussion in T. Gerety, Redefining Privacy, 12 Harv.L. Rev. 233 (1977).

21. *See*, Restatement (Second) Torts §§ 625A–652I (1977).

[85 S.Ct. 1678, 14 L.Ed.2d 510]; in the Ninth Amendment, *id.*, at 486 [85 S.Ct. 1678 at 1682] (Goldberg, J., concurring); or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, see *Meyer v. Nebraska*, 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923). These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325 [, 58 S.Ct. 149, 152, 82 L.Ed. 288] (1937), are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, *Loving v. Virginia*, 388 U.S. 1, 12 [, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010] (1967); procreation, *Skinner v. Oklahoma*, 316 U.S. 535, 541–542 [62 S.Ct. 1110, 1113–1114, 86 L.Ed. 1655] (1942); contraception, *Eisenstadt v. Baird*, 405 U.S., [438] at 453–454 [92 S.Ct. 1029, at 1038–1039, 31 L.Ed.2d 349]; *id.*, at 460, 463–465 [92 S.Ct. 1029, at 1042, 1043–1044] (White, J., concurring in result); family relationships, *Prince v. Massachusetts*, 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944); and child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 535 [45 S.Ct. 571, 573, 69 L.Ed. 1070] (1925), *Meyer v. Nebraska, supra.*

*Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–727, 35 L.Ed.2d 147 (1973).

In response to the frequent criticism that the constitutional concept of a right to privacy is largely undefined,[22] the Supreme Court attempted to categorize its privacy right decisions. In *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Court was presented with a challenge to the constitutionality of a New York statute which established a central computer file containing the names and addresses of all persons who had obtained, pursuant to a doctor's prescription, drugs for which there is a lawful and unlawful market. The appellees argued that the statute invaded their constitutionally protected "zone of privacy."

**22.** *See, e. g.*, The Private I, University of Chicago Magazine, 7, 8 (Autumn 1976); Tribe, American Constitutional Law, Ch. 15 (1978).

429 U.S. at 598, 97 S.Ct. at 876. Justice Stevens, writing for a unanimous Court explained "[t]he cases sometimes characterized as protecting 'privacy' have in fact involved two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters,[23] and another is the interest in independence in making certain kinds of important decisions." [24] *Id.* at 599, 97 S.Ct. 876. The appellees contended that the statute threatened to impair both their interest in non-disclosure of public information (their concern that their use of the drug would become known), plus their interest in making important decisions independently (their decision to take a prescribed drug would be inhibited by the disclosure requirement). After examining the state's safeguards to prevent unauthorized access to the data, and concluding that this risk of unauthorized access was too insubstantial to pose a real threat to patient privacy, the court held "that neither the immediate nor threatened impact of the patient identification requirement . . . on

**23.** In his dissent in *Olmstead v. United States*, 277 U.S. 438, [478,] 48 S.Ct. 564, [572,] 72 L.Ed. 944, [66 A.L.R. 376,] Mr. Justice Brandeis characterized "the right to be let alone" as "the right most valued by civilized men"; in *Griswold v. Connnecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, [1681,] 14 L.Ed.2d 510, the Court said: "[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion." See also *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542; *California Bankers Assn. v. Shultz*, 416 U.S. 21, 79, 94 S.Ct. 1494 [, 1526], 39 L.Ed.2d 812 (Douglas, J., dissenting); *id.*, at 78, 94 S.Ct. 1494 [, at 1525,] 39 L.Ed.2d 812 (Powell, J., concurring).
429 U.S. at 599 n. 25, 97 S.Ct. at 876 n. 25.

**24.** *Roe v. Wade*, [supra 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147]; *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201; *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010; *Griswold v. Connecticut*, [supra 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510]; *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; [39 A.L.R. 468]; *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 [29 A.L.R. 1446]; *Allgeyer v. Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832. In *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, [1166,] 47 L.Ed.2d 405, the Court characterized these decisions as dealing with "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas, it has been held that there are limitations on the States' power to substantively regulate conduct."
429 U.S. at 599–60 n. 26, 97 S.Ct. at 876–877 n. 26.

either the reputation or independence of patients for whom Schedule II drugs are medically indicated is sufficient to constitute an invasion of any right or liberty protected by the Fourteenth Amendment. 429 U.S. at 603–604, 97 S.Ct. at 878.

In the oral argument of the present case the defendant asserted a constitutional right to privacy, and in order to preserve his privacy rights, he wishes to prevent public disclosure of the private matters sought to be suppressed. The seeds of this right stem from the Fourth Amendment of the United States Constitution. The Fourth Amendment provides in part that:

[t]he right of the people to be secure in their person, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . .

In *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Supreme Court initially noted the relationship between the Fourth Amendment and an individual's privacy interest. In *Boyd*, the Court pointed out that "a compulsory production of a man's private papers to establish a criminal charge against him . . . is within the scope of the Fourth Amendment to the Constitution in all cases in which a search and seizure would be, because it is a material ingredient and effects the sole object and purpose of the search and seizure." *Id.* at 622, 6 S.Ct. at 528. The Court elaborated on the Fourth Amendment's protection of an individual's privacy rights and stated that it applies

. . . to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offense . . . .

*Id.* at 630, 6 S.Ct. at 532.

However, the accepted remedy for the protection of this privacy interest has been the application of the doctrine of exclusion. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Moreover, not until there had been marshalled impressive empirical data justifying the need for the rule of exclusion, was exclusion mandated for those violations. To urge an even more stringent remedy without the slightest attempt to justify the need for this additional protection, boarders on the frivolous and requires no further consideration. It certainly does not warrant engrafting such a significant intrusion upon the basic right of access of the public in criminal proceedings.

## V.

In conclusion, we wish to emphasize that our holding today is not intended to eliminate the right of the trial court to order closure of a pre-trial proceeding where such an order is to assure the defendant of his or her fair trial right.[25] *Philadelphia Newspapers, Inc. v. Jerome, supra.* We are only saying that closure may not be ordered where some other available procedural device can fully protect the defendant's right in a given instance. Here, counsel for Mr. Hayes stated, before the bar of this Court, that sequestration in this case fully protected his client's right to a fair trial. The assistant district attorney indicated that the procedure recommended by *Press* would not adversely affect the prosecution's position in this case.[26] In this posture, we were faced with the proposition, which we answer in the negative, whether closure can be permitted where fair trial

**25.** After an examination of the various views expressed by the members of the U.S. Supreme Court in *Gannett v. DePasquale, supra*, a consideration of Art. I, section 11 of the Pennsylvania Constitution, and an analysis of the asserted privacy claim, we find no basis for concluding that the provisions of rule 323(f) may not be used in appropriate situations.

**26.** One of the inherent weaknesses of the procedure of sequestration is that it limits the Commonwealth's right to appeal from suppression rulings. Once the jury is empanelled, double jeopardy considerations are triggered. Here, as cited in the text, this is apparently not a concern of the prosecution.

considerations can be fully satisfied by a means which will not intrude upon the public's access to criminal proceedings and the prosecution and the orderly administration of justice are not adversely affected.[27]

Accordingly, the request for extraordinary jurisdiction is granted, the order appealed from is reversed and the cause is remanded.

LARSEN, FLAHERTY and KAUFFMAN, JJ., filed concurring opinions.

ROBERTS, J., filed a dissenting opinion in which EAGEN, C. J., and O'BRIEN, J., joined.

LARSEN, Justice, concurring.

The defendant, David Hayes, a Pennsylvania state legislator from Erie, Pennsylvania, was arrested and charged with two counts of rape, two counts of involuntary deviate sexual intercourse, one count of indecent assault, and one count of corruption of a minor.

Immediately prior to the commencement of trial, the Honorable Samuel Strauss (the trial judge) ordered the suppression hearing closed to the public and the media. The Pittsburgh Press Company intervened and petitioned this Court for the exercise of plenary jurisdiction and for a stay and reversal of the lower court's order. We granted the stay and immediately heard oral argument from the attorneys for the Pittsburgh Press Company, Tribune-Review Publishing Company, Allegheny County District Attorney's office and defendant.

I would hold that all criminal proceedings are open to the public and to the media. The public's and the media's right

---

**27.** We fully recognize that in many situations sequestration will not offer a viable alternative to closure. However, the horrors graphically depicted by Mr. Justice Roberts have no applicability to the case before us. (*See* dissenting opinion, Roberts, J., pages 347–350). Here the adequacy of sequestration is undisputed. We are duty bound to decide questions based on the record before us and not upon specters conjured up by those who would seek to find justification for reaching a particular result.

to attend these proceedings is absolute. Article I, Section 11 of the Pennsylvania Constitution provides "All Courts shall be open"; this article prohibits secret or closed hearings and trials.

Human institutions have a tendency toward corruption; only when certain checks and balances are permitted and/or imposed does this tendency become neutralized. The tendency of corruption in the judiciary becomes greatest when the public and the media (the public's eyes and ears) are excluded from judicial proceedings. As I conceive of a democracy and of a free and informed citizenry, the right of the public and of the media to attend court proceedings must be absolute.

The rights of a litigant/defendant can be adequately protected by numerous judicial tools: change of venue, postponements, voir dire of prospective jurors, sequestration of jurors, etc.[1]

Therefore, I would reverse the lower court's order and remand for further proceedings consistent with *this* opinion.

FLAHERTY, Justice, concurring.

Quite simply, our Constitution plainly states, "All courts shall be open," thus *proscribing* the closing of a court proceeding. There are *no* exceptions and no discretion to be exercised, other than to utilize available alternatives, such as change of venue, sequestration, and the like; but, in no event is the closure of a court proceeding constitutionally permissible.

KAUFFMAN, Justice, concurring.

To the extent that the Opinion of the Court reverses the Order of the trial court closing the pretrial suppression hearing, I join. However, in light of the fundamental,

---

1. For a view of problems that some courts have had in attempting to resolve this issue, *see Gannett v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); *United States v. Cianfrani,* 573 F.2d 835 (3rd Cir. 1978); *Philadelphia Newspapers, Inc. v. Jerome,* 478 Pa. 484, 387 A.2d 425 (1978).

historical and constitutional importance of the right of public access to judicial proceedings, I would go on to hold explicitly that petitioner's reporters and the general public have a constitutionally protected right to be present at all adjudicative judicial proceedings, and that this right of access may be limited only when strictly and inescapably necessary to protect a criminal defendant's Sixth Amendment right to a fair trial. Accordingly, I would remand this matter to the trial court for an evidentiary hearing and a careful balancing of these two competing constitutional rights.

## I. FACTUAL BACKGROUND

This controversy initially arose as a result of criminal proceedings instituted by the Commonwealth against David Hayes in the Court of Common Pleas of Allegheny County. Because defendant is a representative in the State Legislature, and because he is charged with sexually assaulting and supplying drugs to a seventeen year old male high school student, this case has attracted the attention of both the public and press.[1]

At the start of the suppression hearing, which had been scheduled to commence immediately prior to trial, defendant, by oral motion concurred in by the prosecution, requested the trial court to close the hearing to the public and the press.[2] Petitioner, The Pittsburgh Press Company (hereinafter "The Press"), thereupon successfully petitioned the

---

1. On the record before us, it is impossible to measure the nature and extent of press attention in this case because the trial judge did not require evidence of either actual or potential prejudicial publicity.

2. The motion for closure was made pursuant to Rule 323(f) of the Pennsylvania Rules of Criminal Procedure which provides:
    The hearing, either before or at trial, shall be held in open court unless defendant moves that it be held only in the presence of the defendant, counsel for the parties, court officers and necessary witnesses. If the hearing is held after the jury has been sworn, it shall be held outside the hearing and presence of the jury. In all cases the court may make such order concerning publicity of the proceedings as it deems appropriate under Rules 326 and 327. Pa.R.Crim.P. 323(f). *See also* Pa.R.Crim.P. 323(g), 326 & 327.

trial court for leave to intervene for the purpose of opposing the closure motion. *See generally United States v. Cianfrani*, 573 F.2d 835, 845–46 (3d Cir. 1978).

Arguing against closure, The Press suggested that the jury be selected and sequestered prior to the hearing. Such a course of action, it was argued, would protect the jury from any exposure to media reports concerning the suppression hearing and would be convenient because the trial was scheduled to commence immediately. Without any effort by defendant to demonstrate that he would be deprived of a fair trial by an open suppression hearing, the trial court rejected the procedure proposed by The Press and ordered the hearing closed.[3]

## II. CONSTITUTIONALLY PROTECTED RIGHT OF ACCESS TO PRETRIAL SUPPRESSION HEARINGS

The threshold inquiry is whether the public has a constitutionally protected right of access to judicial proceedings in general, under either the United States or the Pennsylvania Constitution, and, if so, whether that right extends to pretrial suppression hearings.

### A. *The United States Constitution*

In *Gannett Company v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), a sharply divided United States Supreme Court narrowly affirmed an order excluding the public and press from a pretrial suppression hearing, holding that the closure order in that case did not conflict with current constitutional standards. A majority of the Court, however, in two separate opinions, expressly recognized a federal constitutional right of access to pretrial suppression

---

**3.** Following this ruling, the trial court granted The Press a temporary stay in order to seek review by this Court. The Press filed a Petition for Stay which was granted by Mr. Justice O'Brien. The Press also filed petitions urging that this Court exercise its plenary jurisdiction, *see* 42 Pa.C.S.A. § 726 (Purdon Pamph.1979), and summarily reverse the trial court's closure order. This Court agreed to exercise jurisdiction, granted permission to all media representatives to intervene, and, on March 11, 1980, heard oral arguments on the Petition for Summary Reversal.

hearings. Mr. Justice Blackmun, in a concurring and dissenting opinion joined by Messrs. Justice Brennan, White and Marshall, concluded that the public has a right under the Sixth Amendment to attend criminal proceedings, notwithstanding the fact that it is the accused who seeks closure. 99 S.Ct. at 2921–33 (Blackmun, J., concurring in part and dissenting in part).[4] In Mr. Justice Blackmun's view, this right of access extends to pretrial suppression hearings, *id.* at 2933–36, and must be balanced against a criminal defendant's Sixth Amendment right to a fair trial. *Id.* at 2936–39. Mr. Justice Blackmun concluded:

> I emphasize that the trial court should begin with the assumption that the Sixth Amendment requires that a pretrial suppression hearing be conducted in open court unless a defendant carries his burden to demonstrate a strict and inescapable necessity for closure.

*Id.* at 2938.

Although the majority in *Gannett* expressly reserved consideration of the applicability of the First Amendment, 99 S.Ct. at 2911–12, Mr. Justice Powell, in a concurring opinion, concluded that the First and Fourteenth Amendments protect the public's right of access to pretrial suppression hearings, 99 S.Ct. at 2914–16 (Powell, J., concurring):

> Because of the importance of the public's having accurate information concerning the operation of its criminal justice system, I would hold explicitly that petitioner's reporter had an interest *protected by the First and Fourteenth Amendments* in being present at the pretrial suppression hearings.

*Id.* at 2914 (emphasis added) (footnote omitted).[5]

---

4. Because Mr. Justice Blackmun concluded that Sixth Amendment standards were sufficient to protect the right of public access, he deemed it unnecessary to reach the issue of access under the First Amendment. 99 S.Ct. at 2940 (Blackmun, J., concurring in part and dissenting in part).

5. In my view, freedom of the press as guaranteed by the First Amendment embraces three essential rights: (1) right of access, (2) right of publication, and (3) right of circulation. Although none of these rights is absolute, arbitrary curtailment of any of them would

In the "Opinion of the Court," [6] Mr. Justice Stewart concluded that the Sixth and Fourteenth Amendments do not give the public a constitutional right of access to pretrial suppression hearings. 99 S.Ct. at 2904–13. Although Mr. Justice Stewart recognized "a strong societal interest in public trials," he construed the language of the Sixth Amendment guaranteeing to "the accused" the right to a public trial literally to mean that the protective right was intended solely for the benefit of the defendant. *Id.* at 2905, 2907. Mr. Justice Stewart further concluded that even if the Sixth Amendment did establish a right of public access, that right would not extend to pretrial proceedings.[7] *Id.* at 2907.

cripple the ability of the press to perform its vital functions. The United States Supreme Court has established a heavy presumption against the validity of any order restraining publication, *see Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), and the right of circulation also has been carefully guarded. *See Philadelphia Newspapers, Inc. v. Swarthmore*, 381 F.Supp. 228, 240 (E.D.Pa.1974). *See also Lovell v. Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938); *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); *Re Jackson*, 96 U.S. 727, 24 L.Ed. 877 (1878). The right of access has not yet been accorded the same protection as the other two, *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978); *Saxbe v. Washington Post*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), but there should be no doubt that press access to as critical a governmental function as pretrial suppression hearings must be constitutionally protected if freedom of the press is to have any vitality whatsoever.

6. Although Mr. Justice Stewart's opinion in *Gannett* was denominated the "Opinion of the Court," it obtained that designation only because Mr. Justice Powell joined in affirming the trial court's closure order based upon his belief that the trial court had "recognized the constitutional right of the press and public to be present at criminal proceedings" and had "concluded, however, that in the 'very unique situation' presented to it, closure had been appropriate . . ." 99 S.Ct. at 2916–17 (Powell, J., concurring). In stark contrast, the trial court in the instant case gave no recognition or weight to the constitutional right of the press and public to be present at the pretrial suppression hearing.

7. While reserving decision on the question of whether the First and Fourteenth Amendments guarantee public and press access, Mr. Justice Stewart concluded that, even if that were so, the trial court

Thus, five Justices in *Gannett* expressly recognized a federal constitutional right of public and press access to pretrial suppression hearings. They did not, however, agree on either the appropriate standard of review or the specific constitutional underpinnings of the right.[8] Accordingly, I now turn to the Constitution of this Commonwealth.[9]

## B. *The Pennsylvania Constitution*

Article 1, Section 11 of the Constitution of this Commonwealth provides: "All courts shall be open." This constitutional mandate has been a part of Pennsylvania jurisprudence since colonial days. The Pennsylvania Frame of Government of 1682, "[i]n many ways, [one of] the most influential documents protecting individual rights," provided that in the Pennsylvania colony "all courts shall be open." 1B Schwartz, The Bill of Rights: A Documentary History 130, 140 (1971). This provision was later incorporated into Section 26 of Pennsylvania's Constitution of 1776. *Id.* at 271.

had adequately "balanced the 'constitutional right of the press and the public' against the 'defendant's right to a fair trial.' " 99 S.Ct. at 2912.

**8.** It is unclear whether the right of access is protected under the First or the Sixth Amendment. *See United States v. Cianfrani*, 573 F.2d 835, 846–51 & 861–63 (3d Cir. 1978). It is also unsettled whether the right of access may be limited at trial. *See Richmond Newspapers, Inc. v. Virginia*, Va., *cert. granted*, 444 U.S. 896, 100 S.Ct. 204, 62 L.Ed.2d 132 (1979). Several members of the Supreme Court have attempted to clarify the meaning of *Gannett* in an unprecedented series of extrajudicial statements. *See The Supreme Court, 1978 Term*, 93 Harv.L.Rev. 60, 65 n. 32 (1979). These comments underscore the confusion and uncertainty which pervades this area of federal constitutional law.

**9.** The Court in *Gannett* made clear that although a criminal defendant's right to a public trial is guaranteed by the Sixth Amendment, the public trial clause does not guarantee to a criminal defendant the correlative right to waive a public proceeding and compel closure. 99 S.Ct. at 2907. *See also* 99 S.Ct. at 2924–25 (Blackmun, J., concurring in part and dissenting in part). Indeed, the Court implicitly acknowledged the power of the states to afford greater protection to the public's right of access than that recognized by the federal constitution. 99 S.Ct. at 2912–13.

Our state constitutional requirement that "[a]ll courts shall be open" is derived from the strong common law policy in favor of public proceedings. *In re Oliver*, 333 U.S. 257, 268–71, 68 S.Ct. 499, 505–507, 92 L.Ed. 682 (1948). The rule that all judicial proceedings are presumed to be public was considered at common law as a check on judicial power and a deterrent to perjury. In describing trial procedures, Blackstone noted that "all . . . evidence is to be publicly allowed or disallowed, in the face of the country; which must curb any secret bias or partiality that might arise in his own breast." 3 W. Blackstone, Commentaries * 372. Blackstone also viewed the public proceeding as a deterrent to perjury, since "a witness may frequently depose that in private which he will be ashamed to testify in a public and solemn tribunal." *Id.* at * 373.

Wigmore noted that public proceedings serve a vital societal function in that they move the court, the parties and the witnesses "more strongly . . . to a strict conscientiousness in the performance of duty." 6 J. Wigmore, Evidence in Trials at Common Law § 1834 at 438 (Chadbourne rev. 1976). Moreover, public proceedings were recognized as an important means of educating the public about the processes of government and of instilling confidence in the judgment of the courts:

> Not only is respect for the law increased and intelligent acquaintence acquired with the methods of government, but a strong confidence in judicial remedies is secured which could never be inspired by a system of secrecy.

*Id.* (footnote omitted). *See In re Oliver*, 333 U.S. 257, 268, 270, 68 S.Ct. 499, 505, 506, 92 L.Ed. 682 (1948).

In 1827, Jeremy Bentham forcefully commented on the relationship between public confidence in the judicial system and open proceedings:

> Without publicity, all other checks are insufficient: in comparison of publicity all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks,

446

would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance.

1 J. Bentham, Rationale of Judicial Evidence 524 (1827).

When construed in the light of its common law origins, there can be little doubt that the "open courts" clause of our Constitution was intended to establish a public right of access to adjudicative judicial proceedings. Indeed, the provision that "[a]ll courts shall be open," unless it is to be construed as a mere constitutional frill, admits of no other reasonable interpretation.[10] That our "[a]ll courts shall be open" language was intended to create a public right to open civil and criminal adjudicative judicial proceedings was expressly recognized by Mr. Justice Stewart in *Gannett.* In reaching his conclusion that the Sixth and Fourteenth Amendments do not afford the public a federal constitutional right to attend criminal trials, Mr. Justice Stewart discussed "whether the common-law rule of open proceedings was incorporated, rejected or left undisturbed by the Sixth Amendment." 99 S.Ct. at 2908. Although he concluded that the common law rule had not been incorporated by the Sixth Amendment, he noted:

*In conspicuous contrast with some of the early state constitutions* that provided for a public right to open civil and criminal trials, the Sixth Amendment confers the

**10.** Mr. Justice Nix correctly observed in the Opinion of the Court that some of our cases have inferred that the primary concern of Article 1, Section 11 was "to assure the accused of protection against star-chamber proceedings." Opinion of the Court at 322. This protection, however, is fully covered by the independent constitutional guarantee found in Article 1, Section 9. To construe the open courts provision as nothing more than a guarantee of a "speedy public trial" would disregard the plain language of Article 1, Section 11 and in conflict with basic canons of constitutional interpretation, relegate it to a simple redundancy. *See Commonwealth v. Russo,* 388 Pa. 462, 131 A.2d 83 (1957). Significantly, in contrast to the language of Article 1, Section 9 guaranteeing the accused a speedy public trial, the "open courts" provision is not framed as a right of the accused or indeed of any specific party in a judicial proceeding. Given the generality with which it has been framed, it is obvious that the right to "open courts" is to be enjoyed by the public generally and may be asserted by any member of the public.

right to a public trial only upon a defendant and only in a criminal case.

*Id.* at 2908–09 (emphasis supplied). Among the "early state constitutions" referred to and quoted by Mr. Justice Stewart were the Pennsylvania Constitutions of 1682 and 1776, both of which provided that "[a]ll courts shall be open." *Id.* at 2908–09 & nn.15–16. Thus, Mr. Justice Stewart recognized in *Gannett* that Article 1, Section 11 "provide[s] for a public right to open civil and criminal trials." *Id.* at 2908–09.

As was stated almost 100 years ago in a commentary on Article 1, Section 11:

> The meaning of the words all courts shall be open, used in the Constitution of the Commonwealth, is that all courts shall be open for the administration of law, right and justice, in controversies between suitors, as matter of right, and not as of grace or favor. . . . The general public also have the right of admission to the court, as they are largely interested in the public administration of law and justice.

Pierce, J., *All Courts Shall be Open,* 30 Pitts.L.J. 362 (1883).

The concerns that prompted the framers of the Pennsylvania Constitution to provide the "open courts" guarantee described above are no less vital today. Indeed, confidence in the proper functioning of our judicial system is of particular concern in light of the general public distrust of government institutions engendered by recent disclosures of misconduct at all levels of government. Anything that impairs the open nature of judicial proceedings threatens to undermine the confidence of the public in judicial remedies and to impede the ability of the courts to function. Secret hearings will always be suspect, and public confidence cannot long be maintained if important judicial decisions are made behind closed doors. *United States v. Cianfrani,* 573 F.2d 835, 851 (3d Cir. 1978).

For this reason, the appearance of impropriety in the administration of criminal justice is as destructive as its reality. For, the tenuous fabric of public confidence in our criminal justice system will surely unravel when those cases

which receive the most public attention are closed to public and press scrutiny precisely *because* of the public notoriety and, perhaps, public controversy surrounding the proceedings. Indeed, the bitter irony of any test which exalts closure at the expense of openness is that those criminal proceedings most in need of scrutiny to maintain the confidence of the public in the administration of criminal justice, such as the instant case involving the alleged homosexual rape of a teenager by a state legislator, will be shrouded in secrecy.

That the public's right of access extends to pretrial suppression hearings is clear not only from the language of Article 1, Section 11,[11] but from a consideration of the societal interests sought to be protected as well. A suppression hearing differs significantly from those incidental or collateral discussions held outside the presence of the jury, such as sidebar conferences on points of law or conferences in chambers, from which the public traditionally has been excluded. *United States v. Cianfrani*, 573 F.2d 835, 849 (3d Cir. 1978), *citing, Bennett v. Rundle*, 419 F.2d 599, 605 (3d Cir. 1969). A suppression hearing has "more of the characteristics of a testimonial hearing, which is the essence of a trial proceeding." *Bennett v. Rundle*, 419 F.2d 599, 605 (3d Cir. 1969). Moreover, the pretrial suppression hearing often is critical since it may result in either a dismissal of the charges or a plea of guilty. *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 2933, 61 L.Ed.2d 608 (1978) (Blackmun, J., concurring in part and dissenting in part). *See United States v. Cianfrani*, 573 F.2d 835, 848–51 (3d Cir.

---

**11.** The Constitution of Pennsylvania should be interpreted in the light of ordinary language. *Peoples Bridge Co. of Harrisburg v. Shroyer*, 355 Pa. 599, 50 A.2d 499 (1947). In construing the language of a constitutional provision, the words used, unless they are technical, are to be interpreted in their popular, natural, and ordinary meaning. *Commonwealth v. Harmon*, 469 Pa. 490, 366 A.2d 895 (1976); *Commonwealth v. Hiltner*, 307 Pa. 343, 161 A. 323 (1932). Furthermore, the courts have no right to disregard, erode or distort any provision of the Constitution, especially where its plain language makes its meaning unmistakably clear. *Commonwealth v. Russo*, 388 Pa. 462, 131 A.2d 83 (1957).

1972); *United States v. Clark,* 475 F.2d 240, 246–47 (2d Cir. 1973). As Mr. Justice Powell noted in *Gannett*:

> In our criminal justice system as it has developed, suppression hearings often are as important as the trial which may follow. The government's case may turn upon the confession or other evidence that the defendant seeks to suppress, and the trial court's ruling on such evidence may determine the outcome of the case. Indeed, in this case there was no trial as, following the suppression hearing, plea bargaining occurred that resulted in guilty pleas. In view of the special significance of a suppression hearing, the public's interest in this proceeding often is comparable to its interest in the trial itself.

99 S.Ct. at 2914 n.1 (Powell, J., concurring).

Of equal importance, suppression hearings typically involve objections to the propriety of police or prosecutorial conduct. In fact, the suppression hearing may be the only point in the trial process at which the conduct of law enforcement officers is at issue. *United States v. Clark,* 475 F.2d 240, 247 (2d Cir. 1973). Such conduct frequently occurs outside the public view, *Bennett v. Rundle,* 419 F.2d 599, 606 (3d Cir. 1969); therefore, beneficial *public* scrutiny may never take place if not at the hearing itself. *Id. See also Gannett Co. v. DePasquale,* 99 S.Ct. at 2930, 2934 (Blackmun, J., concurring in part and dissenting in part).[12] Our strong constitutional requirement of public access to judicial proceedings emphasizes that publicity is "of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

---

12. The modern suppression hearing was unknown at common law where objections to the admissibility of evidence were made in open court during trial, and "[t]here is no federal requirement that states conduct suppression hearings prior to trial." *Gannett Co. v. DePasquale,* 99 S.Ct. 2898, 2935 (1978) (Blackmun, J., concurring in part and dissenting in part). *See Pinto v. Pierce,* 389 U.S. 31, 32, 88 S.Ct. 192, 193, 19 L.Ed.2d 31 (1967).

Again, as Mr. Justice Stewart acknowledged in *Gannett*, although "[n]ot many common-law rules have been elevated to the status of constitutional rights," 99 S.Ct. at 2908, the public's right of access to judicial proceedings has been accorded such status in Pennsylvania since 1682. *Id.* at 2909. *See* 1 B. Schwartz, The Bill of Rights: A Documentary History 271 (1971). Therefore, in order to protect the societal interests involved, and because of the clear constitutional language, I would hold that the public's right of access to pretrial suppression hearings is guaranteed by Article 1, Section 11 of the Pennsylvania Constitution.[13]

### III.   A CAREFUL BALANCING IS NECESSARY FOR ANY LIMITATION ON ACCESS

The policies underlying the Pennsylvania Constitution's guarantee that "[a]ll courts shall be open" require that there be a strong presumption in favor of public access to adjudicative judicial proceedings. This presumption, however, does not require that all proceedings be held in open court when to do so would deprive a defendant of a fair trial. The right of access is not absolute, and when faced with a demonstrable conflict between the public's right of access and a defendant's ability to obtain a fair trial, the rights of the criminal defendant must prevail. Any other balance would be unjust and would conflict with both the United States and Pennsylvania Constitutions. U.S.Const. amend. VI; Pa.Const. art. 1, § 9. *See Lucas v. Michigan*, 420 F.2d 259 (6th Cir. 1970); *Sudekum v. Hayes*, 414 F.2d 41 (6th Cir. 1969).

Although the right of access under Article 1, Section 11 does not absolutely prevent a trial court from ordering closure in those few exceptional cases where, on balance,

**13.** *See Commonwealth v. Klinger*, 75 D. & C.2d 664 (1976), in which the court held that since the Pennsylvania Constitution mandates that "all courts shall be open," representatives of the media could not be excluded from a preliminary hearing on a charge of murder in order to prevent publicity which may be prejudicial to a defendant's case. *Id.* at 664–65. The court, however, did note that an exception might be made if the court were confronted with unique and compelling evidence of a clear and present danger of uncorrectable prejudice to the right of the defendant to secure a fair trial. *Id.* at 665.

such extraordinary relief is necessary to preserve a defendant's right to a fair trial, the trial court must begin with the presumption that the judicial proceedings will be open. An accused who seeks closure must then establish that any limitation of the right of access is "strictly and inescapably necessary" in order to protect the fair trial guarantee. *Gannett Co. v. DePasquale*, 99 S.Ct. at 2936 (Blackmun, J., concurring in part and dissenting in part). *See Bennett v. Rundle*, 419 F.2d 599, 607 (3rd Cir. 1969). This standard will protect the public's right of access without unnecessarily impairing the rights of the accused. For the future guidance of trial courts in dealing with the recurring confrontation between these vital constitutional guarantees, I would adopt the approach essentially defined by Mr. Justice Blackmun in *Gannett* and hold that in meeting this admittedly heavy burden, the criminal defendant who seeks closure must, at a minimum, establish the following:

First, that there is a substantial probability that irreparable damage to his fair trial right will result from conducting the proceeding in public. Such a showing will necessarily involve evidence of the nature and extent of publicity prior to the closure motion and the impact of that publicity on the jury pool. In this regard, the trial court should be aware of the fact that "[i]n the overwhelming majority of criminal trials, pretrial publicity presents few unmanageable threats" to the right of the accused to a fair trial. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 551, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1976). A high level of publicity is not necessarily inconsistent with the ability of a defendant to obtain a fair trial when the publicity has been largely factual in nature, *Murphy v. Florida*, 421 U.S. 794, 802, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975); *Beck v. Washington*, 369 U.S. 541, 542–45 & 557–58, 82 S.Ct. 955, 956–958, 958–959, 8 L.Ed.2d 98 (1962), or when it abated some time prior to trial. *See Stroble v. California*, 343 U.S. 181, 191–94, 72 S.Ct. 599, 604–606, 96 L.Ed. 872 (1952). In those cases where a court has found publicity sufficiently prejudicial as to warrant reversal on due process grounds, the publicity went far beyond the normal bounds of coverage. *See, e. g.,*

*Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). *See also Nebraska Press Association v. Stuart,* 427 U.S. 539, 551–56, 96 S.Ct. 2791, 2799–2801, 49 L.Ed.2d 683 (1976); *Murphy v. Florida,* 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035–2036, 44 L.Ed.2d 589 (1975). But "[c]ases such as these are relatively rare," *Nebraska Press Association v. Stuart,* 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976), and the decisions of the Supreme Court, "[t]aken together, . . . demonstrate that pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Id.*

Second, a criminal defendant seeking closure must establish that there is a substantial probability that alternatives to closure will not adequately protect his right to a fair trial. Such a showing will necessarily involve consideration of the available alternatives, including continuance, severance, change of venue, change of venire,[14] *voir dire,* peremptory challenges, sequestration, and admonition of the jury. *See* American Bar Association Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press, Standard 8–3.2 at 16 (Approved Draft 1978). *See also Nebraska Press Association v. Stuart,* 427 U.S. 539, 562–65, 96 S.Ct. 2791, 2804–2806, 49 L.Ed.2d 683 (1976); *Sheppard v. Maxwell,* 384 U.S. 333, 354 n.9 & 358–62, 86 S.Ct. 1507, 1518 n.9, and 1519–1522, 16 L.Ed.2d 600 (1966).

Third, the accused must demonstrate that there is a substantial probability that closure will be effective in protect-

---

14. On April 1, 1980, 42 Pa.C.S.A. § 8702 became effective and provides, in part:

§ 8702. *Impaneling jury from another county*

(A) General rule.—If, upon motion and following a hearing, the court of common pleas determines that a fair and impartial jury cannot be impaneled in the county where the criminal complaint is filed, as an alternative to issuing an order for a change of venue the court may direct that jurors be impaneled from another county. The order for impanelment of a jury from another county shall be certified forthwith to the Supreme Court which shall designate and notify the county of impanelment.

ing against the perceived harm. *Philadelphia Newspapers, Inc. v. Jerome,* 478 Pa. 484, 503, 387 A.2d 425, 434–35 (1978). For example, where significant prejudicial information already has been published, the justification for closure dissipates. Moreover, the fact that a pretrial suppression hearing is closed may, by itself, result in prejudice to a defendant similar to the bias which sometimes results from a criminal defendant's failure to testify on his own behalf. *See generally Commonwealth v. Maloney,* 469 Pa. 342, 365 A.2d 1237 (1976); *Commonwealth v. Lowery,* 440 Pa. 361, 269 A.2d 724 (1970).

Fourth, the defendant must establish the extent to which closure is necessary to ensure a fair trial. *United States v. Cianfrani,* 573 F.2d 835, 854 (3d Cir. 1978); *United States v. Ruiz-Estrella,* 481 F.2d 723, 725 (2d Cir. 1973).[15] Thus, only that portion of the public may be excluded from only that portion of the proceeding that the court finds to be strictly and inescapably necessary to protect the interests asserted by the defendant.[16]

In light of the societal interests which are advanced by open judicial proceedings, the critical role of the organized

**15.** Even a narrowly drawn closure order, however, may not adequately protect the public's right of access. Delayed access to the transcript of a closed proceeding, for example, rarely will be an adequate substitute for attendance at the hearing itself. The inherent delay may defeat the purpose of a public proceeding because later events may diminish the public's interest. *See Bridges v. California,* 314 U.S. 252, 268, 62 S.Ct. 190, 196, 86 L.Ed. 192 (1941). "As a practical matter . . . the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly." *Nebraska Press Association v. Stuart,* 427 U.S. 539, 561, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976).

**16.** For example, it may be possible in many cases to determine the admissibility of evidence without disclosing the substance thereof. Issues often concern not so much the contents of a confession or the nature of evidence seized, but the circumstances under which the prosecution obtained the material. *Gannett Co. v. DePasquale,* 99 S.Ct. 2898, 2937 (1978) (Blackmun, J., concurring in part and dissenting in part); *United States v. Cianfrani,* 573 F.2d 835, 858 (3d Cir. 1978).

press—the newspapers and other established news media—in our judicial system must be considered in evaluating the need for closure. *See generally* Stewart, P., "Or of the Press," 26 Hastings L.J. 631 (1975). Judicial proceedings by their very nature are of interest to those concerned with the administration of government, and a "public benefit" is performed by the accurate reporting of judicial proceedings by the media. *Cox Broadcasting Co. v. Cohn,* 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975). For that reason, truthful reports of public judicial proceedings have been afforded special protection against subsequent sanctions, either criminal or civil. *Id.* at 492–93, 95 S.ct. 1029, at 1044–1045. *See also Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947). Even when the Supreme Court has reversed a criminal conviction because of prejudicial publicity, the critically important role of the press in our judicial system has been reaffirmed:

> A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors and judicial processes to extensive public scrutiny and criticism.

*Sheppard v. Maxwell,* 384 U.S. 333, 350, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600 (1966). *Accord Nebraska Press Association v. Stuart,* 427 U.S. 539, 559–60, 96 S.Ct. 2791, 2802–2803, 49 L.Ed.2d 683 (1976). Without public criminal trial proceedings, the conduct and misconduct of judges as well as police and prosecutors could be shrouded in secrecy and the ordinary citizen would be unable to scrutinize and evaluate the performance of his appointed and elected officials. Therefore, whether the foundation for this fundamental right of access is the First Amendment to the United States Constitution, the Sixth Amendment to the United States Constitution or Section 11 of Article 1 of the Pennsylvania Constitution, no one can deny the necessity for an ever-vigilant press

to disclose misconduct, corruption and ineptitude in the administration of criminal justice.

Finally, if the right of access is to have any real meaning, representatives of the press and public must be given a reasonable opportunity to be heard on the question of this exclusion from the courtroom.[17] Upon timely motion, it is incumbent upon the trial court to afford the opportunity for those representatives of the press and public present in the courtroom to move to intervene and be heard on the issue of whether the closure of the proceeding is strictly and inescapably necessary. At such hearing, it is the burden of the party requesting closure to make the requisite showing of prejudice.

As a critical part of the hearing procedure, the trial court must state on the record the findings it considered in balancing the alleged need for closure against the constitutionally protected right of access. This procedure was not followed by the trial court in this case. The record before us discloses nothing more than that the defendant sought closure, the prosecution did not object, and the trial court, without any balancing of the competing constitutionally protected rights, simply agreed.[18]

The foregoing standards articulate a burden of proof significantly higher than that adopted in this Court's prior decisions. *Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa.

17. Because of the unique position which the press occupies in our society, special consideration must be given to its role in evaluating the need for closure. This special consideration derives not because the press enjoys a special status, but because "[i]n seeking out the news, the press . . . acts as an agent of the public at large," each individual member of which cannot obtain for himself "the information needed for the intelligent discharge of his political responsibilities." *Saxbe v. Washington Post Co.*, 417 U.S. 843, 863, 94 S.Ct. 2811, 2821, 41 L.Ed.2d 514 (1974) (Powell, J., dissenting). *Cf. First National Bank of Boston v. Bellotti*, 435 U.S. 765, 776–78, 98 S.Ct. 1407, 1415–1416, 55 L.Ed.2d 707 (1978).

18. It should be noted that the trial court's procedure in this case failed to satisfy not only the standards adopted in *Gannett* by Messrs. Justice Blackmun, Brennan, White and Marshall, but those advocated by Mr. Justice Powell as well. *See* 99 S.Ct. at 2916 (Powell, J., concurring).

484, 387 A.2d 425 (1978), was the combined appeal of three cases in which writs of mandamus and prohibition were sought to end the closure of pretrial hearings. *Id.*, 478 Pa. at 489–90, 387 A.2d at 427–28. Therein, this Court upheld the constitutionality of Rules 323(f)–(g), 326 and 327 of the Pennsylvania Rules of Criminal Procedure which permit a trial court, at the request of the defendant, to enter an order limiting public access to a pretrial suppression hearing. While acknowledging that the United States Supreme Court had suggested that the public's interest in open criminal proceedings is protected by the Sixth Amendment, *Id.*, 478 Pa. at 501–02, 387 A.2d at 433–34, *citing, Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) (dictum), this Court stated that the Supreme Court had not held that either the First or Sixth Amendment creates a constitutionally protected right of access to the courts. 478 Pa. at 502, 387 A.2d at 433. Thus, this Court recognized only a "strong interest" on the part of the public with respect to access to judicial proceedings.

Nevertheless, this Court held that any limitation on access should be carefully drawn to comply with the following standards: (1) the right of access should not be limited except for the compelling state obligation to protect the constitutional rights of criminal defendants and achieve the fair, orderly, prompt and final disposition of criminal proceedings; (2) the right of access should not be limited unless the threat posed to the protected interest is serious; (3) the right of access should not be limited unless the limitations imposed effectively limit the threatened harm and are no broader in scope than necessary to do so. *Id.*, 478 Pa. at 503–04, 387 A.2d at 434–35. In the instant case, the lower court failed to follow even these guidelines, and reversal of the closure order would be appropriate for that reason.[19]

**19.** Defendant Hayes made no effort to demonstrate that his right to a fair trial would be prejudiced by an open suppression hearing. Moreover, the trial court failed to balance the defendant's right to a fair trial against the constitutionally protected right of public access and failed to consider the alternatives to closure that were available.

Our decision in *Jerome,* however, preceded the Supreme Court's decision in *Gannett,* and must be reevaluated in light of that decision.[20] More importantly, the effect of Article 1, Section 11 of the Pennsylvania Constitution was not considered in *Jerome,* and the stricter standards set forth in this opinion appear to be more appropriately suited to protect the public access right envisioned by that constitutional guarantee.

## IV. CONCLUSION

It has long been held that "justice cannot survive behind walls of silence." *Sheppard v. Maxwell,* 384 U.S. 333, 349, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600 (1966). This maxim is true even when those walls are erected at the behest of a criminal defendant. The confluence of the need to maintain public confidence in the integrity of the administration of criminal justice, the need to expose misconduct or ineptitude in the criminal justice process, and the right of the public to be informed of the alleged crimes of accused persons, requires that pretrial suppression hearings be shrouded in secrecy only when it is strictly and inescapably necessary to do so in order to preserve the right of an accused to a fair trial.

A democratic society ultimately can survive only so long as its leaders and institutions have the consent of its citizens. Secret judicial proceedings would be a significant first step in undermining that consent.

I would hold that the public and the press have a right of access to pretrial suppression hearings protected by both the

20. Although the origin and scope of the public's federal constitutional right of access to pretrial suppression hearings remains unsettled, a majority of the Supreme Court has now expressly recognized such a right based solely on the United States Constitution. In *Jerome,* this Court premised its decision, at least in part, on the need to avoid delayed trials and retrials and the concomitant expenditure of public funds and judicial resources. 478 Pa. at 507, 387 A.2d at 436. While this objective is a salutary one in a context where the constitutional right of the public and the press is not present, it cannot, as *Gannett* demonstrates, be used to tip the scales in favor of closing a pretrial suppression hearing.

458

United States and Pennsylvania Constitutions, reverse the Order of the trial court[21] and remand for a hearing[22] in accordance with the standards set forth in this opinion.[23]

ROBERTS, Justice, dissenting.

Only two years ago this Court, presented with precisely the same question now before us, denied by a unanimous vote a petition for extraordinary review challenging those provisions of our Rules of Criminal Procedure which allow the trial court to close pretrial suppression of evidence hearings on a showing of a serious threat to the fair trial rights of an accused. *Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa. 484, 387 A.2d 425 (1978). On appeal the United States Supreme Court unanimously dismissed for want of a substantial federal question, 443 U.S. 913, 99 S.Ct. 3104, 61 L.Ed.2d 877 (1979), a disposition on the merits, see *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). On the same day, the United States Supreme Court upheld the closure of a pretrial suppression of evidence hearing against the challenge that the sixth and fourteenth amendments insure the public and the media a right of attendance. *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

Whatever then may be said about the public interests involved in the resolution of the merits of this issue, surely any "need for clear and decisive judicial direction," Opinion

**21.** Implicit in the conclusions which I have reached is a finding that Rules 323(f)–(g), 326 and 327 of the Pennsylvania Rules of Criminal Procedure must be read to include a requirement for evidentiary hearings as described in this opinion. Otherwise, those rules, which facially permit closure of a judicial proceeding simply upon motion by the defendant, would be unconstitutional.

**22.** The matter should be remanded to the trial court for an evidentiary hearing to determine whether any restriction on access is strictly and inescapably necessary in order to protect defendant's right to a fair trial. In making that determination, all available alternatives to closure should be carefully and expressly considered.

**23.** The accused public official in this case asserted at oral argument that an open suppression hearing would jeopardize his right of privacy. I join the Opinion of the Court in rejecting this claim.

of Mr. Justice Nix, ante at 318, is not served by the type of ad hoc determination indulged in by the Court today. This Court has occasionally been required to modify its views in light of contrary pronouncements by the United States Supreme Court, see e. g., *Ferri v. Ackerman*, 444 U.S. 193, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979) rev'g 483 Pa. 90, 394 A.2d 553 (1978). But I cannot discover any prior instance in which this Court has changed its views because the United States Supreme Court has declared them correct. It must regrettably be concluded that today's determination is based on something less than neutral principles of law or a need for "clear and decisive judicial direction," and is instead based on perhaps little more than the pursuit of media approval. Today's decision represents a raw exercise of judicial power which must necessarily unsettle all those who have trusted in the process of principled judicial decision-making.

The exercise of extraordinary jurisdiction in this case is plainly inappropriate. This is so not only because this Court has only recently unanimously rejected the appropriateness of such an intrusion. Today's exercise of extraordinary jurisdiction is particularly irresponsible given that those voting to exercise that jurisdiction cannot agree on what, if any, error the trial court in this case has committed.

Mr. Justice Nix votes to exercise extraordinary jurisdiction only to offer his advice that the trial court should consider, as an alternative to closure, the novel procedure of selecting and sequestering a jury before the suppression hearing and then permitting the hearing to be open to the media. But Mr. Justice Nix does not suggest that our guidelines established in *Jerome* permitting closure on a showing of a serious threat to the fair trial rights of an accused are no longer controlling. Nor does he suggest that the trial court, on reconsideration, may not reinstate its order of closure. Remarkably, then, Mr. Justice Nix votes to exercise extraordinary jurisdiction merely to ask the trial court to consider a proposal which the record establishes the trial court has already considered and properly rejected.

Mr. Justice Kauffman also votes to exercise extraordinary jurisdiction so that he may take the opportunity to express his views on the question of closing pretrial suppression hearings. Unlike Mr. Justice Nix, however, Mr. Justice Kauffman would expressly limit the permissibility of an order of closure to cases of strict and inescapable necessity. This view, accepted by no other member of this Court, is plainly contrary to this Court's unanimous decision in *Jerome*. Although Mr. Justice Kauffman asserts that he has discovered this principle from a plain reading of the Pennsylvania Constitution, it is obvious that this view represents little more than a personal preference for media prerogatives and is not based on any adequate consideration of the constitutionally guaranteed fair trial rights of citizens involved in our criminal justice system. It must be emphasized, however, that Mr. Justice Kauffman, like Mr. Justice Nix, does not deny the possibility that closure of the suppression hearing may have been and may still be the appropriate procedure in this case.

Finally, Mr. Justice Larsen and Mr. Justice Flaherty also vote to exercise extraordinary jurisdiction so that they may also now express their views on the question of closure. In contrast with Mr. Justice Nix and Mr. Justice Kauffman, however, Mr. Justice Larsen and Mr. Justice Flaherty would hold, as an absolute rule, that all criminal proceedings should be open to the public and the media. These two Justices, in refusing to acknowledge the possibility of any limiting considerations, thus adopt a position not seriously advocated by any prior caselaw or scholarship and, indeed, a position which the media itself has never purported to advance. This position, if accepted, would plainly deny to those citizens involved in cases of widespread publicity rights expressly guaranteed by both the federal and state Constitutions.

Thus, in complete disregard of the defendant's right to a speedy trial and the public interest in the prompt resolution of criminal proceedings, a majority of this Court has interrupted and delayed the present criminal case in order to do little more than create a forum for the expression of the

separate and inconsistent views of its members. This unnecessary tampering with our criminal justice system is a clear misuse of the judicial power. I dissent and would deny this petition for extraordinary review.

## THE NARROW ISSUE PRESENTED HAS ALREADY BEEN DECIDED BY THIS COURT

It is important to make clear what issues are not involved in this case. Not presented here is any question concerning the propriety of closing from the public or the media the trial of any criminal case.[1] The order which we are asked to review authorizes only the closure of a pretrial suppression proceeding.[2]

Not presented here is any question concerning the permissibility of an order preventing the media from publishing any material or information in their possession or from writing about whatever they please. The order authorizing closure of the pretrial suppression proceeding is not a prior restraint on the media. *Gannett*, supra at 393 n. 25, 99 S.Ct. at 2912; id. at 398–99, 99 S.Ct. at 2915 (Powell, J., concurring); id. at 411–412, 99 S.Ct. at 2922 (Blackmun, J., dissenting); *Jerome,* supra, 478 Pa. at 499–500, 387 A.2d at 432–33; compare *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

1. The media litigants in this case make no claim that their right of access is greater than that of the public. See *Pell v. Procunier,* 417 U.S. 817, 833–35, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974); compare *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 2914–15, 61 L.Ed.2d 608 (1979) (Powell, J., concurring); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 850, 94 S.Ct. 2811, 2815, 41 L.Ed.2d 514 (1974) (Powell, J., dissenting).

2. The permissibility of closing the trial of a criminal case, in so far as the question is controlled by the federal Constitution, is raised by a case presently pending before the United States Supreme Court, *Richmond Newspapers, Inc. v. Virginia,* juris. postponed, 444 U.S. 896, 100 S.Ct. 204, 62 L.Ed.2d 132 (1979). *Jerome* considered only closure, pursuant to Pa.R.Crim.P. 323(f), of a pretrial suppression hearing. [Editor's Note: After decision and during publication of the present case the United States Supreme Court announced its decision in *Richmond Newspapers, Inc. v. Virginia,* —— U.S. ——, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).]

Also not presented here is the permissibility of permanently withdrawing from the public view or from the media any part of any judicial proceeding. It is clear that our criminal procedural rules require, in the event that a pretrial suppression hearing is closed, that a transcript of the hearing be made and that the transcript be made available when the dangers of public disclosure have abated. Pa.R.Crim.P. 323(g).

Finally, not presented here is any objection by the defendant to closure of the hearing. Our rules clearly permit closure only on the defendant's own motion.[3] In the present case the defendant's motion for closure was joined by the Commonwealth, which has filed a brief in this Court in support of the motion.

The narrow substantive question presented by this case is the propriety, on motion of the defendant and the prosecution, of temporarily excluding the press from a pretrial suppression proceeding in a criminal case when the trial judge is satisfied that public disclosure of the information to be adduced at the hearing will likely prejudice the defendant's rights at his subsequent public jury trial. Crucially, however, the issue today is even narrower, for we are required to consider the need for addressing the question presented on a petition for extraordinary review.

This is precisely the issue we decided in *Jerome*, where this Court unanimously dismissed such a petition because

3. Both the federal Constitution, Amends. VI & XIV and our state Constitution, art. I, § 9, insure the "accused" a "public trial." This case does not require consideration of whether these constitutional guarantees provide a defendant an absolute right to public pretrial proceedings.

On the other hand, *Jerome*, in allowing a trial judge to close pretrial suppression hearings only when the defendant's constitutional right to a fair trial and the public's interest in orderly prompt criminal proceedings are seriously threatened, 478 Pa. at 503, 387 A.2d at 434–35, necessarily forecloses the argument that a defendant has an absolute right to waive public pretrial suppression proceedings and insist that they be closed. *Jerome* clearly acknowledged the general interest in open judicial proceedings, id., 478 Pa. at 501, 513, 387 A.2d at 434, 439, and required the trial court to exercise sound discretion in resolving the question of closure.

there was no showing that any clear rights of the media petitioners in that case had been violated. Today's petitioners fail to demonstrate any basis on which to distinguish this case from *Jerome*, and they do not present any reason why the rights they claim cannot be adequately protected by the ordinary means of appellate review. Accordingly I can see absolutely no reason why this petition should not be similarly dismissed. Because, however, of the unfortunate failure of a majority of my Brethren to be guided by recent binding decisional law, it is apparently necessary to restate and explain controlling principles.

## THE CONSTITUTIONAL RIGHT TO A FAIR TRIAL REQUIRES THAT THE JURY NOT CONSIDER EVIDENCE INADMISSIBLE AT TRIAL

Both the federal Constitution and our state Constitution guarantee to the criminally accused a fair trial by an impartial jury. U.S.Const., Amends. VI & XIV; Pa.Const. art. I, § 9. And minimum standards of due process require that the "impartial jury" will base its verdict only on evidence properly received in open court, and not from outside sources. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976); *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209, cert. denied, 414 U.S. 878, 94 S.Ct. 164, 28 L.Ed.2d 124 (1973); *Commonwealth v. Stewart*, 449 Pa. 50, 295 A.2d 303 (1972), cert. denied, 417 U.S. 949, 94 S.Ct. 3078, 41 L.Ed.2d 670 (1974). "Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. State of California*, 314 U.S. 252, 271, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941). For as Justice Holmes observed many years ago:

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

*Patterson v. State of Colorado ex rel. Attorney General,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907).

It is now well-established that evidence obtained in violation of a defendant's constitutional rights is not admissible at the defendant's trial. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). To protect this basic right the Constitution requires that the trial judge, outside the hearing of the jury, must determine if challenged evidence is the product of constitutionally impermissible government conduct and so must be excluded. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Only if the judge is satisfied that the evidence is admissible may the jury then hear it.[4]

In response to this constitutional obligation to allow a defendant the opportunity, outside the hearing of the jury, to test the admissibility of the evidence obtained by the Commonwealth, our Rules of Criminal Procedure provide the defendant a pretrial hearing. Pa.R.Crim.P. 323. Generally these hearings are open to the public. Yet in the ordinary case testimony taken at such a suppression hearing will receive little if any public attention, and those jurors eventually sworn to judge a defendant's case will neither have heard any of the evidence before nor be aware if any evidence has been excluded.

This is not so, however, in cases of high publicity. In such cases, should there be a suppression hearing, any evidence or testimony produced at the hearing will likely reach the general public, including potential jurors. Even in the event that all the challenged evidence is found admissible there is

---

**4.** The Supreme Court has squarely rejected any system which permits the jury to hear such evidence and relies on cautionary instructions to the jurors that they must disregard incriminating evidence they believe impermissibly obtained. Clearly it is unrealistic to believe that, having heard such impermissible evidence, jurors will be able to exclude it from their minds. "The naive assumption that prejudicial effects can be overcome by instructions to the jury, . . . all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring) quoted in *Jackson,* supra 338 n. 15, 84 S.Ct. at 1787.

always the problem that potential jurors will prematurely become aware of incriminating evidence without the due process safeguards afforded by trial procedures or by cross-examination. In the event, however, that any evidence is suppressed, publicity of the hearing will in all probability inform potential jurors of evidence which, by definition, the courts have found that jurors should not hear. Additionally, should the defendant testify at his suppression hearing it is likely that media coverage will report this testimony. Yet it is established that, on the defendant's objection, the Constitution forbids the use of this testimony at trial. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

In cases receiving substantial media attention the possibility that a significant portion of the jury pool will become aware of inadmissible evidence is not speculative or imaginary. Indeed, courts have not infrequently been required to reverse convictions when it has appeared that jurors have been exposed to prejudicial pretrial publicity. E. g., *Sheppard v. Maxwell*, supra; *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd*, supra; *Commonwealth v. Frazier*, 471 Pa. 121, 369 A.2d 1224 (1977); *Commonwealth v. Pierce*, supra. Thus recognizing in these special cases the potential for unfairness to citizens involved in the criminal process and the potential for disruption of the orderly administration of our criminal justice system, our Rules of Criminal Procedure permit a trial judge, on motion of the defendant, to exclude the media from a pretrial suppression hearing. Pa.R.Crim.P. 323(f).[5]

5. Rule 323(f) provides:
   "(f) The hearing, either before or at trial, shall be held in open court unless defendant moves that it be held in the presence of only the defendant, counsel for the parties, court officers and necessary witnesses. If the hearing is held after the jury has been sworn, it shall be held outside the hearing and presence of the jury. In all cases the court may make such order concerning publicity of the proceedings as it deems appropriate under Rules 326 and 327."
   Rule 326 grants the trial court authority to issue orders governing witnesses and parties and concerning other procedures in widely-

## *JEROME* PROPERLY PERMITS ORDERS CLOSING PRE–TRIAL SUPPRESSION HEARINGS BASED ON THE EXISTENCE OF A SERIOUS THREAT TO A FAIR TRIAL

In *Philadelphia Newspapers, Inc. v. Jerome* this Court considered challenges to the permissibility of trial court orders under this section of our Rules. There this Court was asked to assume extraordinary jurisdiction to review orders by three trial judges closing three pre-trial suppression hearings. Each case involved a serious crime and was an event of high-publicity. One of these three cases, *Commonwealth v. Boyle,* was the nationally reported murder trial of former United Mine Workers President W. A. "Tony" Boyle.

*Jerome* began by carefully reviewing the purposes served by our Rules of Criminal Procedure. This review started with the recognition that the Rules "are intended to provide for the just determination of every criminal proceeding," and "to secure simplicity in procedure, fairness in administration and the elimination of unjustified expense and delay." Pa.R.Crim.P. 2. Our unanimous Court clearly explained the genuine public advantage to be served by the use, in an appropriate case, of our Rules concerning closure:

"These Rules are designed to promote the clear public interest in having persons accused of crime tried fairly, expeditiously, economically, and only once. If prejudicial publicity occurs, the trial court may have to continue the case, change venue, resort to extensive voir dire to assure that the attitudes of jurors have not been influenced by disclosure, or use the costly and inconvenient device of jury sequestration. See *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). If the trial court takes inadequate remedial measures, an appellate court would be compelled to reverse a conviction, starting the trial process anew.

\* \* \* \* \* \*

publicized or sensational cases. Rule 327 regulates public disclosure by court personnel in pending or imminent criminal proceedings. The present case presents no question under these rules.

Prejudicial publicity from pre-trial suppression hearings injures the Commonwealth as well as the accused. Prejudicial disclosures may taint a trial or require a trial court to delay trial until publicity subsides. Neither delayed trials nor retrials present as favorable opportunities for establishing truth as timely first trials. By precluding prejudicial disclosures arising from pre-trial suppression hearings, the Rules promote the speedy and effective enforcement of the criminal laws, ensure swift convictions deterring crime, see A. von Hirsch, Doing Justice (1976), and avoid unnecessary expenditures of public funds and judicial resources."

478 Pa. at 498, 507, 387 A.2d at 432, 436–37 (footnote omitted); see *Barker v. Wingo*, 407 U.S. 514, 519, 92 S.Ct. 2182, 2186, 33 L.Ed.2d 101 (1972) ("there is a societal interest in providing a speedy trial which exists separate from . . . the interests of the accused.").

*Jerome* next fully considered claims by the media that a right of access to pretrial proceedings is guaranteed by the first and sixth amendments as applied to the states through the due process clause of the fourteenth amendment. We acknowledged the important interest in public trials and in maintaining the judicial process open to public view. Without doubt open judicial proceedings serve to advance the quality of justice by insuring that all participants act conscientiously and by enhancing the possibility that those with information or evidence will be alerted or will be willing to come forward. And, indeed, the mere possibility of public scrutiny certainly promotes public confidence that the process of criminal justice is operating as it should. 478 Pa. at 501, 513, 387 A.2d at 434, 439; see *Gannett*, supra at 382–83, 99 S.Ct. at 2907. In the case of pretrial suppression hearings, however, *Jerome* refused to find an absolute right of access constitutionally guaranteed. Rather this Court unanimously concluded that in appropriate cases the need to protect an accused's right to a fair trial and the goal of promoting the public interest in an orderly criminal process permitted the closure of a pretrial suppression hearing. We

in no way suggested that such hearings should be casually or frequently closed. Nor did this Court permit closure on nothing more than the motion of the defendant. *Jerome* was firm that "any limitation on access should be carefully drawn."

> "First, the right of access to court proceedings should not be limited for any reason less than the compelling state obligation to protect constitutional rights of criminal defendants and the public interest in the fair, orderly, prompt, and final disposition of criminal proceedings. Second, access should not be limited unless the threat posed to the protected interest is serious. Third, rules or orders limiting access should effectively prevent the harms at which they are aimed. Finally, the rules or orders should limit no more than is necessary to accomplish the end sought."

478 Pa. at 503–504, 387 A.2d at 434–35 (footnotes omitted).

Based on these standards this Court concluded that the media petitioners in *Jerome* had not demonstrated such an invasion of their rights as required extraordinary relief and this Court denied their petitions. On appeal to the United States Supreme Court the case was dismissed for want of a substantial federal question, 443 U.S 913, 99 S.Ct. 3104, 61 L.Ed.2d 877 (1979), see *Hicks v. Miranda*, supra.

This was the very same day the Supreme Court decided *Gannett*, in which the Court rejected the claim that the "public trial" clause of the sixth amendment guarantees the public or the media any right to attend pretrial suppression hearings. In addition, the Court, although reserving consideration of any right of access under the first amendment, indicated that if any such right exists, it had been satisfied by the trial court, which had entertained media arguments in favor of access before deciding to close the suppression hearing in that case.[6] Importantly, in upholding the action

---

6. Mr. Justice Powell, a member of the majority, wrote separately to indicate his belief that the first amendment guaranteed media access absent a showing that without closure the defendant's right to a fair trial would likely be jeopardized. 443 U.S. at 400–401, 99 S.Ct. a

of the trial court, the Supreme Court expressly rejected any rule which would limit the availability of closure orders to cases of "strict and inescapable necessity." 443 U.S. at 378, 99 S.Ct. at 2904.

In the circumstances of the present case, it is unnecessary to predict exactly what place the first amendment will eventually find. Rather it is sufficient to note that *Gannett* forecloses any claim that the first amendment requires a showing of strict necessity in order to authorize an order of closure. I am convinced that *Jerome's* approval of closure orders based on a showing of a "serious threat" to fair trial rights gives adequate protection to both sixth and first amendment values and that the guidelines established in *Jerome* will survive any subsequent federal constitutional scrutiny. Moreover, I do not understand any member of this Court to suggest otherwise.

Similarly, the Pennsylvania Constitution does not preclude the possibility of closure in the circumstances described in *Jerome*. As Mr. Justice Nix acknowledges, nothing in our prior cases suggests that either art. I, § 9 or art. I, § 11 of our state Constitution can be read as guaranteeing the media a right to attend pretrial suppression hearings in every case. And it must be emphasized that only three Justices purport to find any basis in our state Constitution for requiring that closure orders must be limited more strictly than this Court suggested in *Jerome*.

These three Justices focus on art. I, § 11, which provides:

"All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."

2916. But he concluded that the trial court had properly considered first amendment interests in authorizing closure. On the other hand, Mr. Justice Rehnquist, also joining the opinion of the Court, wrote separately to note that he would not find any first amendment right of access. 443 U.S. at 404–406, 99 S.Ct. at 2918–19.

Two of these three Justices, Mr. Justice Larsen and Mr. Justice Flaherty, would read this provision as an absolute prohibition against closed pretrial suppression proceedings. Yet this Court has already clearly rejected such an absolute principle. For in *Commonwealth v. Trinkle*, 279 Pa. 564, 124 A. 191 (1924), a case relied on by Mr. Justice Nix, this Court stated:

> "Public trials, with public records, were introduced, and our Constitution perpetuates this practice; but it must not be carried to an illogical and, requiring unreasonable or impossible things . . . ."

*Id.*, 279 Pa. at 568, 124 A. at 192.

Indeed, all three Justices who rely on art. I, § 11 simply fail to locate any single prior decision of this Court or any contemporary historical materials which support their views.[7] Rather, each of these Justices suggests that his view is compelled by a plain reading of the constitutional text. Yet these assertions about the plain meaning of this provision are obviously belied by the fact that these three Justices cannot themselves agree on what the constitutional language means.

Notwithstanding the absolutist view of Mr. Justice Larsen or Mr. Justice Flaherty, it must be obvious that the provisions of our Constitution must be read together. Accordingly the blanket refusal of these two Justices to consider those provisions of our Constitution which guarantee criminal defendants the right to a fair trial before an impartial jury, art. I, §§ 6, 9, is entirely inappropriate. Their approach evidences remarkable disregard for the realities of our criminal justice system and for established principles of fairness and due process.

Although Mr. Justice Kauffman acknowledges the constitutional requirements of a fair trial, I am convinced that his test of strict and inescapable necessity, if followed, would in

---

**7.** Mr. Justice Nix is correct in noting that nearly all our prior cases concerning this provision have construed it as a guarantee of a legal remedy for a wrong or injury. Opinion of Mr. Justice Nix, *ante* at 321.

fact never permit the closure of a suppression hearing. See Remarks of Prof. Kamisar at the First Annual Supreme Court Review and Constitutional Law Symposium, reprinted in The Supreme Court 1978–1979 at 217 (1979). Thus, Mr. Justice Kauffman's approach would also fail to protect either fair trial rights or to account for the public interest in fair and prompt criminal proceedings.[8] I am in agreement with Mr. Justice Powell's thoughtful opposition to a rule allowing closure only on a showing of strict and inescapable necessity:

"It is difficult to imagine a case where closure could be ordered appropriately under this standard. A rule of such apparent inflexibility could prejudice defendants' rights and disserve society's interest in the fair and prompt disposition of criminal trials. As a result of pretrial publicity, defendants could be convicted after less than the meticulously fair trial that the Constitution demands. There also could be an increase in reversal of convictions on appeals. In either event, it seems to me that the approach suggested . . . would not adequately safeguard the defendant's right to a fair trial, a right of equal constitutional significance to the right of access. The better course would be a more flexible accommodation . . .—an accommodation under which neither defendant's rights nor the rights of members of the press and public should be made subordinate."

*Gannett*, supra at 399, 99 S.Ct. at 2915–16 (concurring opinion). There is simply no valid reason under either federal or state constitutional law for now reconsidering the guidelines recently articulated in *Jerome*.

## EXERCISE OF EXTRAORDINARY JURISDICTION IS PLAINLY INAPPROPRIATE

The present case is a prosecution for sex offenses brought against a state legislator. There is no doubt that it has

8. It must be noted that Mr. Justice Kauffman's proposed solution was squarely rejected by the Supreme Court in *Gannett*, supra, at 376–78, 99 S.Ct. at 2904. Thus his suggestion that reconsideration of *Jerome* in light of *Gannett* is now required, ante at 337, is, to say the least, astonishing.

attracted the special interest and curiosity of the media and the public. In the trial court the defendant, pursuant to our Rules of Criminal Procedure, moved to suppress certain evidence and to have the suppression hearing closed. At the time of this motion representatives of the media were apparently present, were permitted by the trial court to intervene and were given an opportunity to present oral argument and to file briefs in opposition to the motion for closure. Although petitioners have not as yet provided this Court with a transcript of these proceedings, we do note that petitioners' trial court briefs contain discussion and citation of *Jerome* as well as *Gannett*. And the record does clearly indicate that the trial judge afforded petitioners a full hearing with a complete opportunity to argue their position. Petitioner *Press* presented to the trial court its proposal that a jury be selected, sworn and sequestered before a suppression hearing and that the hearing then be held in public. The trial judge rejected this suggestion and granted the defendant's motion, supported by the Commonwealth, for closure. Given these proceedings, there is absolutely nothing to suggest that the trial court did not give due consideration to all constitutional values and that the trial court's ruling was not entirely consistent with the guidelines established in *Jerome*, and of course *Gannett*.[9]

**9.** Mr. Justice Kauffman bases his determination to exercise extraordinary jurisdiction on an erroneous belief that because there was no extended evidentiary hearing in the trial court that therefore the trial court necessarily gave no consideration whatsoever to claims of public access or to the possibility of alternative procedures. Ante at 330 n. 6, 337 n. 19. These inferences are wholly impermissible. It is manifestly clear that the trial court did consider the very claims for sequestration now pressed upon this Court, and there is, quite simply, no reason to believe that the trial court failed properly to consider media claims of access. Even assuming that some or all of the elaborate procedural requirements suggested by Mr. Justice Kauffman are appropriate, the possibility that they may not have been followed in this case is simply not a sufficient basis for extraordinary intrusion into this criminal proceeding. Whatever the defendant's burden may properly be when he moves for an order closing the suppression hearing, Mr. Justice Kauffman overlooks the obvious fact that it is the party seeking extraordinary review in this Court, here the media, that always has the affirmative burden of showing such a denial of clear rights as to require this Court's intervention.

Since the *Jerome* case itself did not require our assumption of extraordinary jurisdiction because, as the unanimous Court held, no clear rights were violated, surely in this case, where the trial judge has exercised his discretion under the guidelines announced in *Jerome*, extraordinary jurisdiction is inappropriate.

This Court's view in *Jerome* of the acceptability of pretrial closure orders explicitly rested on our unanimous judgment that other procedural precautions would not always serve to insure the citizen accused a fair trial or serve to protect the public interest in fair, orderly proceedings. Voir dire, continuance, cautionary instructions, sequestration and change of venue were all considered and difficulties with each of them described.[10] *Jerome* of course did not reject the possi-

---

10.  As this Court said in *Jerome*:

"Courts in the past have attempted to deal with prejudicial disclosure by lengthy voir dire of potential jurors, extensive continuances, burdensome sequestration, and cautionary instructions. Because these techniques do not eliminate prejudicial disclosure, but only may reduce some of its effects, all have proven unsatisfactory in many cases. Only one other method, change of venue, may in some cases put a case beyond the physical range of disclosure, but it may not be effective in cases of statewide or national attention, such as *Commonwealth v. Boyle*, or *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Further, pre-trial publicity may follow a case to its new venue.

Through voir dire, a court attempts to minimize the effect of pre-trial publicity by excluding from the jury those whom publicity has biased. But it cannot hope to eliminate all jurors who have been exposed to prejudicial information. In a highly publicized case, effective voir dire may distort the composition of the jury by screening out all those who take an active interest in news and public affairs. Neither a defendant nor the Commonwealth has an interest in seating such a jury. Other methods of dealing with prejudicial disclosure, such as sequestration, continuances, or cautionary instructions to the jury, do not realistically reduce premature prejudicial disclosure to which a jury is exposed.

Finally, many of the methods for eliminating the effects of prejudicial disclosure have other drawbacks. A continuance allows evidence to become stale and lengthens the period during which charges remain unresolved and the accused confined or held on bail pending disposition of the charges. Cf. *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975) (restraints on liberty caused by prolonged detention). Changes of venue and sequestration pose further problems of administration

bility that in a given criminal case one or a combination of these procedures might serve to provide a fair trial. But *Jerome* clearly recognized that each of these procedures has its flaws and that in the event of a case of high publicity closure of the pretrial hearing may obviate the need for these measures. Crucially, *Jerome* did not require that closure be used only upon a showing that it was the only possible procedural device capable of providing a defendant a fair trial. *Jerome* did not establish any test of strict necessity. Rather, *Jerome* permitted the trial court, in the exercise of its sound discretion, to grant a motion for closure on a showing that such an order would serve to avert a serious threat to a defendant's right to a fair trial.

By their very nature, decisions concerning the conduct of pretrial and trial proceedings will, in the individual case, be left to the considered judgment of the trial court. It is the trial court which must shoulder the basic affirmative responsibility to provide a fair trial. *Sheppard v. Maxwell*, supra. And in large measure appellate courts must, here as in many other areas, rely upon the trial court to perform that responsibility properly. *Commonwealth v. Stewart*, supra; *Commonwealth v. Bruno*, supra; see *Commonwealth v. Knight*, 469 Pa. 57, 364 A.2d 902 (1976) (decision to exclude spectators from courtroom during testimony of young witness within discretion of trial court). The trial judge is clearly in a superior position to consider the atmosphere surrounding a trial and in a superior position to consider the practicality of adopting any given procedure.

In substantial part it was an appreciation of these considerations which led this Court to reject the exercise of extraordinary jurisdiction in *Jerome*. Now, having identified the important constitutional values which must be weighed when a defendant moves to have a suppression hearing closed, we must, as an initial matter, trust to the wisdom of the trial judge to consider those values and to

for courts and inconvenience for all persons connected with a case."
478 Pa. at 511, 387 A.2d at 438–39.

authorize closure only upon an appropriate showing. This point is made clearly by Mr. Justice Powell:

"The task of determining the application of these limitations in each individual trial necessarily falls almost exclusively upon the trial court asked to exclude members of the press and public from the courtroom. For it would be entirely impractical to require criminal proceedings to cease while appellate courts were afforded an opportunity to review a trial court's decision to close proceedings."

*Gannett,* supra, 398, 99 S.Ct. at 2915 (concurring opinion).

In this case, where there is absolutely no affirmative showing that the trial court has acted erroneously in ordering closure, the disruptive exercise of extraordinary jurisdiction is glaringly inappropriate. Here the trial of the underlying criminal case has been significantly delayed awaiting these attempts at extraordinary review. Such delays, at the behest of parties other than the defendant or the Commonwealth, ignore the defendant's right to a speedy trial, U.S. Const. amend. VI (speedy trial); Pa.Const. art. I, § 9 (same); Pa.R.Crim.P. 1100 (accused must be brought to trial within 180 days of initiation of criminal proceedings), and ignore the independent public interest in swift and fair proceedings, *Barker v. Wingo,* supra. No interest is served by today's unwise attempt at supervision.

## THE PROPOSED SEQUESTRATION SCHEME IMPOSES ENORMOUS COSTS, PLAINLY FRUSTRATES THE ADMINISTRATION OF CRIMINAL JUSTICE AND MANIFESTLY THREATENS THE RIGHT TO A FAIR TRIAL

Finally, but importantly, the sequestration scheme suggested by Mr. Justice Nix will impose upon the trial court, the defendant, the prosecution and the Commonwealth a completely impractical, unfair and burdensome procedure. The proposal of selecting and swearing a jury prior to the suppression hearing and of sequestering that jury from the time of the hearing until the end of the trial would place pressures and difficulties upon all involved that make such a scheme a clearly unworkable and impermissible alternative.

Mr. Justice Nix asserts, that, at least in the present case, the suppression hearing will occur just prior to trial and thus there will be little delay between sequestration and the beginning of trial. In fact the pretrial scheduling of this case has already produced extended and unforeseen delay. Nothing in the record suggests what further turns the trial of this case may take. Indeed it is unlikely that this Court is ever in a position to judge with any certainty on exactly what schedule any case will proceed.

Of course under this scheme even the shortest delay between the suppression hearing and the trial will not obviate the need to maintain sequestration of the jury throughout the trial, at least in the likely event that the public suppression hearing produces testimony or evidence which will be inadmissible at trial. Clearly the decision to sequester a jury prior to the suppression hearing carries with it the commitment to continue sequestration until a verdict is reached. Thus, this scheme will require sequestration of a jury during the full course of the trial in cases where a closure order may obviate the need for any sequestration whatsoever. Even in the event that trial sequestration may be necessary, under today's proposal any delay between the suppression hearing and the trial will obviously increase the time period during which the jury must be sequestered. As a practical matter this sequestration procedure will result in enormous cost to the counties of this Commonwealth, and cause severe problems of administration and fairness.

First, the Commonwealth must pay, house and feed all twelve jurors and two alternates throughout the entire time of their sequestration. Court administrators in this Commonwealth uniformly report that the average cost for food and lodging alone for only one day is, at a minimum, $600.00. These costs, however, are just the beginning. Sequestration also demands court personnel to supervise and attend to the jurors and security personnel to insure against impermissible contact with the outside community. These groups are necessarily paid at increased rates of compensation for this

special around the clock service. There is also the cost of special transportation to and from the court each day. And there are always a variety of necessary miscellaneous costs for the safety, entertainment and comfort of the sequestered jurors. Finally, in cases of extended sequestration, arrangements must be made for contact visits, for the supervised receipt of mail and for the medical needs or other personal requirements of the jurors. Court administrators report that the average cost of a sequestered jury for a single day is now at least $1500.00 to $1800.00. See *State v. Allen*, 73 N.J. 132, 141, 373 A.2d 377, 381 (1977) (costs of sequestration "enormous").

The financial costs of this procedure are indeed substantial. But economic objections are overshadowed by the extreme unfairness this procedure poses for the defendant.

Having sequestered a jury at such heavy public expense, pressure will inevitably fall upon the trial judge to hurry his disposition of the suppression claims, as well as all other pretrial matters. At a minimum, judicial control of pretrial proceedings will be compromised and matters normally requiring last minute attention or rearrangement quite possibly will be brushed aside.

Clearly, under such self-imposed pressure, any suppression claims will be hastily decided, including those which may require research and reflection. A decision rendered in these circumstances will undoubtedly provide grounds for subsequent appellate review. An erroneous suppression decision may well require that any conviction be reversed and a new trial granted.

Surely those urging this sequestration scheme do not mean to suggest that the Commonwealth or the defendant will not be permitted a continuance after the suppression hearing should they require more time in order properly to prepare for trial. These normal and necessary delays will pose substantial difficulties, however, when a jury waits, impatiently sequestered. In addition, this sequestration scheme is plainly inconsistent with our established rule that the Commonwealth has a right of appellate review, before

trial, in the event that important Commonwealth evidence is suppressed. *Commonwealth v. McDade*, 462 Pa. 414, 416 n.1, 341 A.2d 450, 451 (1975) cert. denied, 424 U.S. 909, 96 S.Ct. 1102, 47 L.Ed.2d 312 (1976); *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304, cert. denied, 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963). The trial judge's awareness of the possibility of a Commonwealth appeal may well dispose him toward denying arguable suppression claims rather than permit the delay which a Commonwealth appeal would require. And of course in the event that evidence is suppressed and an appeal taken, Mr. Justice Nix's sequestered jury will remain, in its hotel, at Commonwealth expense, isolated and idle.

Once the jury is selected and sworn jeopardy attaches. *Crist v. Bretz*, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978). Accordingly, if any problem less than "manifest necessity" results in the discharge of the first jury, the constitutional prohibition against double jeopardy will prohibit "retrial" of the defendant. *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). Realistically, we must expect that any number of problems which may arise during the extended time between selection and sequestration of the jury and the start of trial will be improperly swept under the rug in an attempt to proceed to trial with the original jury. On the other hand, should some serious problem amounting to "manifest necessity" require discharge of the first jury after the hearing but before trial, then the new pool of jurors will have been exposed to the publicity attendant on that hearing. In that event a continuance or a change of venue may be necessitated. At a minimum, further delay and substantial additional expense will ensue.

Fairness will of course require that the trial judge inform members of the jury pool that if selected they may be sequestered for a substantial period of time, for a period far longer than the time required for the trial alone. Thus we may safely anticipate an extended and burdensome selection process as large numbers of potential jurors seek to be

excused on the ground of personal hardship. Inevitably only those jurors who do not have business or personal affairs requiring attention will serve. The natural result of such a skewed selection scheme will be to produce a panel of jurors out of the mainstream of community life. Such a procedure is in direct conflict with the constitutional requirement that jury selection procedures serve to produce a cross-section of the community. *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978); see *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). As this Court has already emphasized: "Neither a defendant nor the Commonwealth has an interest in seating such a jury." *Jerome*, supra, 478 Pa. at 511, 387 A.2d at 438.

Additionally, it is well known that a sequestered jury is at best an impatient jury, and that such juries are likely to develop hostility or resentment toward the defendant. *State v. Allen*, supra at 141, 373 A.2d at 381; id. at 164, 373 A.2d at 393 (Pashman, J., concurring); *United States v. Schiavo*, 504 F.2d 1, 23–24 (3rd Cir. 1974) (Aldisert, J., joined by Weis, J., dissenting); Amsterdam, Segal & Miller, Trial Manual 3 for the Defense of Criminal Cases, ¶ [343], at p. 1–350 (3d ed. 1974 & Supp.1978). Obviously, the possibility of such hostility is markedly increased when the jury spends its days idly in a hotel room rather than, at least, attending court and considering testimony. Not unlikely is the possibility that such a captive jury, frustrated by the entire affair, will attempt to perform its function quickly and without adequate deliberation. *United States v. Acuff*, 410 F.2d 463, 467 (6th Cir. 1969). Again, no interest of justice is served by such a scheme.

Today's novel sequestration scheme will also force the defendant to select a jury before he knows what the Commonwealth's evidence will be. In truth, this scheme deprives both the defendant and the Commonwealth of a *pretrial* suppression hearing altogether. Yet the opportunity to test the admissibility of Commonwealth evidence in order to prepare for trial is an important benefit to the defendant. And no less, the usual pretrial hearing provided

by our Rules affords the Commonwealth the related benefit of preparing its case based on the knowledge of what evidence will be available to it. W. LaFave, 3 Search and Seizure, § 11.1, p. 476–77 (1978). As already indicated, our usual procedure allows the Commonwealth the opportunity to appeal those suppression decisions which significantly effect its case. It is clearly unfair to force the defendant and the Commonwealth to forego these advantages. Indeed it is established that constitutional due process places limits on the degree to which the state may circumscribe the defendant's freedom in making trial decisions. See *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (state may not require defendant, wishing to testify, to do so before other defense evidence is offered). In rejecting the type of sequestration scheme proposed today, the New York Court of Appeals has just recently emphasized these same difficulties:

> "The suggestion that sequestration may serve as an alternative to closure is impractical when a pretrial proceeding is involved. Generally at that stage there are no jurors to sequester and to delay the hearing until the jury has been, or is about to be drawn, would deprive the accused, and often the prosecutor, of the benefit of a pretrial ruling— that is, advance warning and time to prepare for trial on matters essential to the case."

*Westchester Rockland Newspapers, Inc. v. Leggett*, 48 N.Y.2d 430, 444, 423 N.Y.S.2d 630, 639, 399 N.E.2d 518, 526 (1979). Given our system of pretrial suppression hearings, it would be a serious denial of due process for any trial court to require an objecting defendant either to select a jury or to decide whether to waive a jury trial before his suppression motions are decided.

Perhaps worst of all, this scheme will place considerable pressure on a defendant to avoid these difficulties by foregoing his right to a suppression hearing. Few defendants will look happily upon the opportunity to argue their case before a jury which has been left isolated for days or weeks prior to trial. Basic notions of fairness and due process do not

permit this Court to condition the availability of a suppression hearing on consent to such a trial. See *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (government may not condition opportunity to suppress evidence on possibility that testimony at suppression hearing might become admissible at trial); cf. *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) (government may not use fear of death penalty to dissuade defendant from asserting right to jury trial); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (prosecution cannot use statements obtained from police officers threatened with discharge if they refused to testify). The proposed sequestration scheme would obviously place an impermissible chill on the exercise of fundamental fair trial rights.

The proposed sequestration scheme will place onerous burdens on the resources and administration of our criminal justice system. Today's proposal will frustrate and delay prosecutions of criminal trials, will impose severe burdens on sequestered jurors and will create pressures which can operate only to deprive citizens of a fair trial. Inevitably this scheme will force those citizens it affects to face a criminal process significantly more hostile and less fair than ever anticipated by our Rules. It will also create a system clearly contrary to established concepts of due process.

## CONCLUSION

Surely, as *Jerome* acknowledged, generally open judicial proceedings promote public confidence in the judicial system. But, equally, courts do not gain or retain public confidence by the denial of fair treatment to those citizens involved in our criminal process. Today's ad hoc departure from the established limitations on our exercise of extraordinary jurisdiction is plainly misguided and today's action, at the expense of the proper and orderly administration of criminal justice and at the expense of those citizens involved in the criminal justice system, manifestly disserves the interests of justice. One can only hope that a majority of this

Court, less swayed by its perceptions of the fashionable trends of the moment, will soon recognize the error of today's misjudgment.

EAGEN, C. J., and O'BRIEN, J., join in this Dissenting Opinion.